# **Exhibit A**
## Process, Pleadings and Orders

**STATE OF SOUTH CAROLINA**

**COUNTY OF GREENVILLE**

**IN THE COURT OF COMMON PLEAS**

**FRANCIS P. MAYBANK;**

Plaintiff(s)

**CIVIL ACTION COVERSHEET**

2011 DEC 22  P 3: 46

vs.

- CP - ____ - ____

**BB&T CORPORATION,
BRANCH BANKING AND TRUST
COMPANY, Successor in merger to
BRANCH BANKING AND TRUST
COMPANY OF SC,
STERLING CAPITAL
MANAGEMENT, LLC, Successor in
merger to BB&T ASSET
MANAGEMENT LLC,
ROSS WALTERS, and
ANTHONY MAHFOOD,**

FILED-CLERK OF COURT
GREENVILLE CO. S.C.

2011-CP-23-8578

Defendant(s)

| | |
|---|---|
| **(Please Print)**<br>**Submitted By:** Mitchell Willoughby<br>**Address:**    Elizabeth Zeck<br>      Chad Johnston<br>      Willoughby & Hoefer, P.A.<br>      (930 Richland Street)<br>      P.O. Box 8416<br>      Columbia, SC 29202-8416 | **SC Bar #:** 6161<br>**Telephone #:** (803) 252-3300<br>**Fax #:** (803) 256-8062<br>**Other:**<br>**E-mail:** mwilloughby@willoughbyhoefer.com<br>ezeck@willoughbyhoefer.com<br>cjohnston@willoughbyhoefer.com |

**NOTE: The cover sheet and information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is required for the use of the Clerk of Court for the purpose of docketing. It must be filled out completely, signed, and dated. A copy of this cover sheet must be served on the defendant(s) along with the Summons and Complaint.**

## DOCKETING INFORMATION (Check all that apply)

*\*If Action is Judgment/Settlement do not complete*

☒ **JURY TRIAL** demanded in complaint.     ☐ **NON-JURY TRIAL** demanded in complaint.

☐ This case is subject to **ARBITRATION** pursuant to the Circuit Court Alternative Dispute Resolution Rules.

☐ This case is subject to **MEDIATION** pursuant to the Circuit Court Alternative Dispute Resolution Rules.

☐ This case is exempt from ADR (certificate attached).

## NATURE OF ACTION (Check One Box Below)

| Contracts | Torts - Professional Malpractice | Torts – Personal Injury | Real Property |
|---|---|---|---|
| ☐ Constructions (100) | ☐ Dental Malpractice (200) | ☐ Assault/Slander/Libel (300) | ☐ Claim & Delivery (400) |
| ☐ Debt Collection (110) | ☐ Legal Malpractice (210) | ☐ Conversion (310) | ☐ Condemnation (410) |
| ☐ Employment (120) | ☐ Medical Malpractice (220) | ☐ Motor Vehicle Accident (320) | ☐ Foreclosure (420) |
| ☐ General (130) | ☐ Other (299) | ☐ Premises Liability (330) | ☐ Mechanic's Lien (430) |
| ☐ Breach of Contract (140) | | ☐ Products Liability (340) | ☐ Partition (440) |
| ☐ Other (199) | | ☐ Personal Injury (350) | ☐ Possession (450) |
| | | ☐ Other (399) | ☐ Building Code Violation (460) |
| | | | ☐ Other (499) |

| Inmate Petitions | Judgments/Settlements | Administrative Law/Relief | Appeals |
|---|---|---|---|
| ☐ PCR (500) | ☐ Death Settlement (700) | ☐ Reinstate Driver's License (800) | ☐ Arbitration (900) |
| ☐ Sexual Predator (510) | ☐ Foreign Judgment (710) | ☐ Judicial Review (810) | ☐ Magistrate-Civil (910) |
| ☐ Mandamus (520) | ☐ Magistrate's Judgment (720) | ☐ Relief (820) | ☐ Magistrate-Criminal (920) |
| ☐ Habeas Corpus (530) | ☐ Minor Settlement (730) | ☐ Permanent Injunction (830) | ☐ Municipal (930) |
| ☐ Other (599) | ☐ Transcript Judgment (740) | ☐ Forfeiture (840) | ☐ Probate Court (940) |
| | ☐ Lis Pendens (750) | ☐ Other (899) | ☐ SCDOT (950) |

SCCA / 234 (5/04)

Page 1 of 3

Wages Comp (950)
Zoning Board (970)
Administrative Law Judge (980)
Public Service Commission (990)
Employment Security Comm (991)
Other (999)

**Special/Complex /Other**

☐ Environmental (600)          ☐ Pharmaceuticals (630)
☐ Automobile Arb. (610)        ☐ Unfair Trade Practices (640)
☐ Medical (620)                 ☒ Other (699)
                                Breach of Contract, fiduciary
                                duty, SC Securities Act, etc.

**Submitting Party Signature:** _Mitchell Willoughby_ **Date:** __December 22, 2011__

**Note:** Frivolous civil proceedings may be subject to sanctions pursuant to SCRCP, Rule 11, and the South Carolina Frivolous Civil Proceedings Sanctions Act, S.C. Code Ann. §15-36-10 et. seq.

FOR MANDATED ADR COUNTIES ONLY:
Florence, Horry, Lexington, Richland, Greenville**, and Anderson**
** Contact Respective County Clerk of Court for modified ADR Program Rules

SUPREME COURT RULES REQUIRE THE SUBMISSION OF ALL CIVIL CASES TO AN ALTERNATIVE DISPUTE RESOLUTION PROCESS, UNLESS OTHERWISE EXEMPT.

**You are required to take the following action(s):**

1. The parties shall select a neutral within 210 days of filing of this action, and the Plaintiff shall file a "Stipulation of Neutral Selection" on or before the 224th day after the filing of the action. If the parties cannot agree upon the selection of the neutral within 210 days, the Plaintiff shall notify the Court by filing a written "Request for the Appointment of a Neutral" on or before the 224th day after the filing of this action. The Court shall then appoint a neutral from the Court-approved mediator/arbitrator list.

2. The initial ADR conference must be held within 300 days after the filing of the action.

3. Case are exempt from ADR only upon the following grounds:

   a. Special proceeding, or actions seeking extraordinary relief such as mandamus, habeas corpus, or prohibition;

   b. Cases which are appellate in nature such as appeals or writs of certiorari;

   c. Post Conviction relief matters;

   d. Contempt of Court proceedings;

   e. Forfeiture proceedings brought by the State;

   f. Cases involving mortgage foreclosures; and

   g. Cases that have been submitted to mediation with a certified mediator prior to the filing of this action.

4. Motion of a party to be exempt from payment of neutral fees due to indigency should be filed with the Court within ten (10) days after the ADR conference had been concluded.

**Please Note:** **You must comply with the Supreme Court Rules regarding ADR.**
**Failure to do so may affect your case or may result in sanctions.**



STATE OF SOUTH CAROLINA )    IN THE COURT OF COMMON PLEAS
)
COUNTY OF GREENVILLE )  FOR THE THIRTEENTH JUDICIAL CIRCUIT

2011 DEC 22 P 3: 46

FRANCIS P. MAYBANK, )    Civil Action No. 2011-CP-23-8578
)
Plaintiff,

FILED CLERK OF COURT
GREENVILLE CO S.C.

vs. )
)    **SUMMONS**
BB&T CORPORATION, )
BRANCH BANKING AND TRUST )
COMPANY,  Successor in merger to )
BRANCH BANKING AND TRUST )
COMPANY OF SC, )
STERLING CAPITAL )
MANAGEMENT, LLC, Successor in )
merger to BB&T ASSET )
MANAGEMENT LLC, )
ROSS WALTERS, and )
ANTHONY MAHFOOD, )
)
Defendants. )
_____ )

TO THE DEFENDANTS ABOVE NAMED:

**YOU ARE HEREBY SUMMONED** and required to answer the Complaint herein, a

copy of which is herewith served upon you, and to serve a copy of your answer to this Complaint

upon the subscriber, at his office, 930 Richland Street, P.O. Box 8416, Columbia, South Carolina

29202-8416, within thirty (30) days after service hereof, exclusive of the day of such service, and

if you fail to answer the Complaint within the time aforesaid, or otherwise appear and defend,

judgment by default will be rendered against you for the relief demanded in the Complaint.

[SIGNATURE PAGE FOLLOWS]

_Mitchell Willoughby_

Mitchell Willoughby, Esquire
Elizabeth Zeck, Esquire
Chad Johnston, Esquire
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
cjohnston@willoughbyhoefer.com

Attorneys for Francis P. Maybank, Plaintiff

December 22, 2011
Columbia, South Carolina

| | | |
|---|---|---|
| STATE OF SOUTH CAROLINA | ) | IN THE COURT OF COMMON PLEAS |
| | ) | |
| COUNTY OF GREENVILLE | ) | FOR THE THIRTEENTH JUDICIAL CIRCUIT |
| | ) | |
| | ) | |
| **FRANCIS P. MAYBANK,** | ) | Civil Action No. **2011-CP-23-** 8578 |
| | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | **(Jury Trial Demanded)** |
| vs. | ) | |
| | ) | |
| **BB&T CORPORATION,** | ) | |
| **BRANCH BANKING AND TRUST** | ) | |
| **COMPANY, Successor in merger to** | ) | |
| **BRANCH BANKING AND TRUST** | ) | |
| **COMPANY OF SC,** | ) | |
| **STERLING CAPITAL** | ) | |
| **MANAGEMENT, LLC, Successor in** | ) | |
| **merger to BB&T ASSET** | ) | |
| **MANAGEMENT LLC,** | ) | |
| **ROSS WALTERS, and** | ) | |
| **ANTHONY MAHFOOD,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

Plaintiff Francis P. Maybank complains of Defendants BB&T Corporation, Branch

Banking and Trust Company, Successor in merger to Branch Banking and Trust Company of SC,

Sterling Capital Management, LLC, Successor in merger to BB&T Asset Management LLC,

Ross Walters, and Anthony Mahfood and respectfully alleges as follows:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Francis P. Maybank is a citizen and resident of the County of Charleston

in the State of South Carolina.

2.     Upon information and belief, Defendant BB&T Corporation is a financial holding

corporation organized under the laws of the State of North Carolina with its principal place of

1

business in Winston-Salem, North Carolina. BB&T Corporation is a citizen and resident of the State of North Carolina.

3.     Upon information and belief, Defendant Branch Banking and Trust Company is a commercial bank subsidiary of Defendant BB&T Corporation and is organized under the laws of the State of North Carolina with its principal place of business in Winston-Salem, North Carolina. Branch Banking and Trust Company is a citizen and resident of the State of North Carolina.

4.     Upon information and belief, Defendant Sterling Capital Management, LLC is the successor in merger of BB&T Asset Management LLC[1] and a registered investment advisor organized under the laws of the State of North Carolina with its principal place of business in Charlotte, North Carolina. Sterling Capital Management, LLC is a citizen and resident of the State of North Carolina.

5.     The three corporate defendants, BB&T Corporation, Branch Banking and Trust Company, and Sterling Capital Management, LLC, will hereinafter collectively be referred to as "BB&T" and/or "the Bank."

6.     Upon information and belief, Branch Banking and Trust Company is registered to do business in South Carolina and is in good standing with the South Carolina Secretary of State. BB&T engages in continuous and systematic activities within the State of South Carolina, including the use of the courts of this State to enforce contractual and other rights against citizens of South Carolina.

7.     BB&T presently conducts business and, at all relevant times, conducted business and performed acts in Greenville County, South Carolina and has sufficient contacts and

---

[1]  BB&T Asset Management LLC is itself a successor in merger of BB&T Asset Management, Inc.

2

business within Greenville County, South Carolina so as to be subject to the *in personam* jurisdiction of this Court pursuant to the laws of South Carolina.

8.     On information and belief, Defendant Ross Walters is a citizen and resident of the County of Pickens in the State of South Carolina. At the times relevant to the claims herein, Walters was an agent, employee, servant and/or representative of the Wealth Management Department of Branch Banking and Trust Company assigned to its Greenville, South Carolina headquarters. Walters was the senior executive in charge of wealth management functions and business in Greenville on behalf of customers of the Bank and also has obligations related to maximizing and increasing the profits of the Bank from its Greenville operations.

9.     On information and belief, Defendant Anthony Mahfood is a citizen and resident of the County of Greenville in the State of South Carolina. At the times relevant to the claims herein, Mahfood was an agent, employee, servant and/or representative of the Wealth Management Department of Branch Banking and Trust Company. In that capacity, under the supervision of Walters, Mahfood served as the wealth manager in charge of Mr. Maybank's accounts with the Bank.

10.     At all times relevant to this case, Walters and Mahfood were agents, representatives, servants and/or employees of BB&T. All of their actions, inactions, omissions and wrongdoing were performed for and on behalf of the Bank in the course and scope of their agency and/or employment with BB&T. Therefore, in addition to Walters and Mahfood's personal liability for their own actions, inactions and omissions, BB&T is directly liable and also jointly, severally, fully accountable, and totally liable for the mismanagement, misconduct, wrongdoing, actions and/or omissions of Walters and Mahfood under agency law, common law principles of *respondeat superior*, and state securities laws.

3

11.    All claims arising under this Complaint are governed by the laws of the state of South Carolina.    Venue is proper in Greenville County, South Carolina because the most substantial parts of the acts and omissions giving rise to the causes of action in this Complaint occurred in Greenville County, Defendant BB&T has locations in and holds itself out as doing business in that South Carolina county, and because Defendant Mahfood lives and Defendants Walters and Mahfood both work in Greenville County.

12.    All five named defendants, including corporate Defendants BB&T Corporation, Branch Banking and Trust Company, and Sterling Capital Management, LLC, as well as the non-corporate named Defendants Walters and Mahfood, will hereinafter collectively be referred to as "Defendants."

13.    The parties and subject matter involved in this Complaint are within the jurisdiction of this Court.

## STATEMENT OF FACTS

14.    Francis P. Maybank was born in Charleston, South Carolina, on September 30, 1932. As of the filing of this Complaint, Mr. Maybank is seventy-nine (79) years old.

15.    After graduating from college in 1955, Mr. Maybank joined the United States Army and served on active duty as an infantryman for two years, attaining the rank of sergeant. He completed the remaining years of his military commitment in the United States Army Reserve and was honorably discharged.

16.    Beginning in 1958, Mr. Maybank worked in the financial services industry in New York City for over twenty years.  In or around 1980, he moved to Greenville, South Carolina and continued to work in the financial services industry in this State.

4

17.     In 1988, Mr. Maybank formed the Southeastern Trust Company ("Southeastern"), a trust and asset management company based in Greenville, South Carolina that provided trust services and asset management to individuals, businesses, charities and other organizations.

18.     As a result of Mr. Maybank's diligent efforts, prudent management and successful business practices, over the next twelve years his company grew to four offices (one each in Greenville, Anderson, Columbia, and Charleston) with more than $700 million in client assets under management.

19.     In 2001, BB&T contacted Mr. Maybank and expressed its interest in acquiring Southeastern. BB&T entered into discussions with Mr. Maybank to purchase Southeastern. As a part of the acquisition, BB&T told Mr. Maybank that Southeastern's principals, including Mr. Maybank, as well as its employees, would become part of BB&T's organization. BB&T expressed a desire to retain Southeastern's staff to encourage Southeastern's existing clientele and $700 million in assets under Southeastern's management to stay with BB&T.

20.     As a condition of BB&T's purchase of Southeastern, the Bank required Mr. Maybank to stay on as an employee of BB&T for a term of five years, in what was then known as the BB&T Trust Department.

21.     BB&T limited Mr. Maybank's role as a BB&T employee to client relations. Mr. Maybank's responsibilities involved issues of client development, retention, and personal relations in which he was to encourage clients of Southeastern to remain as clients of BB&T and assist with their transition into the BB&T system.

22.     In his new role, Mr. Maybank worked as a member of the BB&T team. BB&T represented that its Wealth Management/Trust Department was highly trained, thoroughly knowledgeable, dedicated to being a champion for the interests of clients, and that it specialized

in working with each client to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client.  As part of his client development responsibilities, Mr. Maybank was required to promote BB&T's corporate culture as being inherently client-centric and conservative and therefore a good fit for Southeastern's clients.

23.    BB&T's senior management held regular staff meetings during which pronouncements were made about the Bank's corporate philosophy, including the high moral obligation to which BB&T always held itself and its employees to put the interests of its clients and customers above the interests of the Bank and its employees.  While employed by the Bank, Mr. Maybank was exposed to these statements which were made both during employee educational trainings and in reports to shareholders.

24.    As a result of this avowed corporate philosophy and culture, Mr. Maybank came to view BB&T as a responsible, capable, knowledgeable and skilled wealth manager that would manage the assets under its control in the best interest of its clients.

25.    BB&T did not provide cash consideration for its acquisition of Southeastern. Instead, in exchange for Mr. Maybank's interest in Southeastern, BB&T agreed to an exchange of its shares for those of Southeastern at a share exchange ratio.  This arrangement resulted in BB&T exchanging its stock for the stock of Southeastern.  As a result of the exchange, BB&T had no cash outlay to complete the transaction, other than costs such as legal and accounting fees.

26.    For his shares of Southeastern, Mr. Maybank received approximately 246,000 shares of common stock in BB&T.

6

27.    BB&T prohibited Mr. Maybank from selling his newly-acquired BB&T stock during a two-year lock-up period following the sale.

28.    Mr. Maybank maintained his role with BB&T for the five (5) years specified in his employment contract. Throughout this period, Mr. Maybank's duties continued in a similar manner as described above.

29.    In or about the summer of 2006, as his employment contract with BB&T was drawing to a close, Mr. Maybank was contemplating total retirement to spend his remaining time with his family enjoying the fruits of his more than fifty years of work. At the time, Francis Maybank was nearing 74 years of age.

30.    BB&T represented to the public, to its customers, and to Mr. Maybank in particular, that it was a prudent, safe, financially knowledgeable and trustworthy institution that was skilled and experienced in the management of funds, assets and wealth and would provide services and advice to its customers in accordance with each customer's particular needs and best interests.

31.    BB&T promoted its Wealth Management Department (formerly known as the Bank's Trust Department) to the general public and to Mr. Maybank claiming it would take an individualized and holistic approach to managing client assets and investments and selling itself as a one-stop shop for client needs.

32.    BB&T represented its Wealth Management Department to the general public and to Mr. Maybank as having highly trained, knowledgeable advisors who, as dedicated fiduciaries, provided their clients with a superior level of integrated services and support.

33.    BB&T represented to the general public and to Mr. Maybank that its wealth managers, including but not limited to Mahfood and Walters, would take time to understand the

7

issues presented by each client's own unique set of circumstances, including the need for conservative and prudent investment management for individuals like Mr. Maybank who were ready to retire and rely on the income generated by their accumulated assets.

34.    BB&T represented to the general public and to Mr. Maybank that it and its employees would serve as partners to the client for investment services and that it and its employers would provide and utilize the best outside resources when needed, including legal counsel, tax advisors or asset managers.

35.    BB&T emphasized to the general public and to Mr. Maybank that its wealth managers, including but not limited to Walters and Mahfood, would tailor investment strategies to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client, and would coordinate and supervise all services offered by the Bank as the custodian and fiduciary of the client's investments.

36.    Based on his experience as an employee of BB&T, Mr. Maybank had come to believe in and trust the Bank's approach to wealth management and its adherence to a corporate philosophy based on high moral obligations to its customers.  Mr. Maybank further believed, based upon the assurances made to him by Defendants, that if he turned over his financial life to BB&T and its employees, including Walters and Mahfood, then the Bank would craft comprehensive solutions tailored to his individual needs and provide prudent, holistic management of his assets and insurance needs. He could then retire with peace of mind, secure in the knowledge that his fiduciary wealth managers would be acting in his best interests.

37.    As he moved into retirement, Mr. Maybank needed and expressly sought the safety and security of fiduciary management of his irreplaceable assets, because in his retirement he intended to delegate investment responsibilities and the management of his assets to

8

professional fiduciaries. Mr. Maybank sought the advice and protection offered by the BB&T Wealth Management/Trust Department, with whom Mr. Maybank had an existing relationship of trust and confidence, and whom he understood owed special duties of care as fiduciaries. Mr. Maybank was assured that the BB&T Wealth Management/Trust Department and its employees, including Mahfood and Walters, provided the added protection and oversight that he sought in retirement and expected from knowledgeable fiduciaries. Because of the fiduciary duties expressly undertaken by the BB&T Wealth Management/Trust Department, Mahfood and Walters, Mr. Maybank understood that Defendants would be obligated to advise him with undivided loyalty, with his best interests in mind, and with competent, non-conflicted advice.

38.    As a result of the representations made by BB&T, Walters, Mahfood and other Bank representatives, Mr. Maybank placed the utmost faith, trust, and confidence in Defendants to look after his financial interests.

39.    Based on this relationship, in or about the summer of 2006, Mr. Maybank met with representatives of the BB&T Wealth Management/Trust Department, including Mahfood and Walters, to engage Defendants as his fiduciaries and entrust them with his assets, so that he could benefit from the Wealth Management/Trust Department's prudent and conservative management of those assets under the plans Defendants would develop for his impending retirement.

40.    In 2006, BB&T was already serving as a fiduciary for Mr. Maybank, as it had sought and accepted the role of trustee under the Irrevocable Trust Agreement created by Mr. Maybank as Grantor ("Insurance Trust"). Mahfood was Mr. Maybank's point of contact at BB&T for advice and service on all matters relating to the Insurance Trust, and on information and belief Walters supervised Mahfood's activities relating to the Insurance Trust.

9

41.   As Mr. Maybank transitioned into full retirement, BB&T's fiduciary role expanded as Mr. Maybank entrusted the vast majority of his financial life to Defendants for management. The assets and issues to be managed included Mr. Maybank's securities holdings, including his BB&T stock, as well as the policies within the Insurance Trust. The Bank also offered its services and agreed to act as the personal representative of Mr. Maybank's estate upon his death. The decision to entrust his financial life to BB&T was made in reliance on the many representations made by the Bank that the professional fiduciaries in its Wealth Management/Trust Department, including Mahfood and Walters, could and would manage all assets entrusted to them, and could and would develop an investment plan designed to safely and prudently meet Mr. Maybank's needs, thus allowing him to enjoy his retirement and the rewards of his many years of work without worry or concern. Mr. Maybank told Defendants that he was relying upon them exclusively for retirement planning and wealth management and, in seeking to become and becoming Mr. Maybank's Wealth Managers, they willingly agreed to accept that responsibility.

42.   BB&T and Mr. Maybank entered into a contractual relationship, ultimately signing a contract prepared by BB&T and entitled the BB&T Wealth Management Agreement, a copy of which is attached as Exhibit A to this Complaint. Under the Wealth Management Agreement, the Bank promised to serve as Mr. Maybank's Wealth Manager as to all assets entrusted to it and to make suitable and appropriate recommendations to Mr. Maybank regarding an investment program and investment guidelines for his assets under management.

43.   Pursuant to their agreement with Mr. Maybank, Defendants agreed to "gather information from [Mr. Maybank] regarding [his] investment objectives, risk tolerance and

10

investment horizon, tax status, financial situation and needs." Using that information, they further agreed to "make recommendations to [Mr. Maybank] regarding an investment program and investment guidelines for [his assets]" and to "coordinate and supervise the services of the Investment Advisor and Custodian for the Account." *See* BB&T Wealth Management Agreement at I. Consistent with its representations of its corporate philosophy, BB&T assumed the duty to act in a client-centered fashion and in Mr. Maybank's best interests. As Mr. Maybank's fiduciaries and pursuant to the Agreement, Defendants were obligated to act in good faith, placing Mr. Maybank's interests before their own and to make only recommendations which would be suitable for Mr. Maybank in light of his investment objectives, risk tolerance and investment horizon, tax status, financial situation and needs.

44. During his meetings with BB&T, Mahfood and Walters, Mr. Maybank explained his investment goals for retirement: paying off debt, ensuring stable and secure income during his lifetime, and protecting his ability to provide for his heirs. Mr. Maybank explained to Defendants that he would be relying upon investment income to fund his retirement, including his on-going family commitments and those involved in the Insurance Trust.

45. Because Mr. Maybank would be losing his source of earned income, he also needed to eliminate debt as he moved into retirement. His principal debt obligation was in a margin account with Scott & Stringfellow, a BB&T affiliated brokerage firm. This debt of approximately $2.3 million resulted from obligations largely incurred while Mr. Maybank had owned and operated Southeastern.

46. While acting as Mr. Maybank's wealth managers, Defendants counseled, advised, and recommended to Mr. Maybank a strategy that unbeknownst to Mr. Maybank was aggressive,

11

excessively risky and completely inappropriate and unsuitable for a retired person like Mr. Maybank.

47.     Defendants faced a serious and irreconcilable conflict of interest between their obligations to advance the company interests of BB&T by promoting its own stock and their fiduciary obligations to advise Mr. Maybank with undivided loyalty and with only his best interests in mind. On information and belief, in 2006 Defendants considered Mr. Maybank to be a BB&T employee. Consistent with BB&T's Code of Ethics, Defendants encouraged and recommended Mr. Maybank to continue to hold as a long-term investment his concentrated position in BB&T stock which represented the bulk of his liquid investment assets. Defendants recognized that it is considered imprudent to have a concentrated position in a single holding, yet that was the advice mandated by their internal policies for Mr. Maybank. In so advising Mr. Maybank, they placed their corporate responsibilities to generate profits for themselves and the Bank above Mr. Maybank's needs for a suitable diversified portfolio.

48.     Rather than recommending that Mr. Maybank reduce his BB&T stock holdings and develop a diversified and prudent portfolio to generate income during his retirement, Defendants instead advised Mr. Maybank to follow an investment strategy based upon derivatives trading with the BB&T stock. This strategy required the execution of a highly complex derivative product known as a Variable Prepaid Forward Contract ("VPFC"). Defendants' stated purpose for the derivative transaction was to raise cash to create a diversified portfolio, which would be placed with Defendants for management. Defendants' scheme maximized the placement of Mr. Maybank's assets in fee-generating accounts at BB&T and was designed to benefit Defendants at Mr. Maybank's expense.

12

49.    While Defendants recognized the speculative nature of this scheme, they nonetheless advised Mr. Maybank that the long-term retention of his concentrated holding of BB&T stock and the use of the VPFC derivative product was not speculative but was instead an appropriate defensive strategy suitable for a retired person.  Defendants further advised Mr. Maybank that this strategy would allow him to reduce the risk of his concentrated position, protect him from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth, maintain long-term share ownership of the BB&T stock, and help him achieve important diversification goals.

50.    Defendants failed to advise Mr. Maybank of the gross conflict of interest existing when they advised him about the management and/or retention of their own company's stock.

51.    Since 1903, BB&T had never failed to pay its shareholders a dividend, a fact BB&T advertised extensively to its employees and shareholders, including Mr. Maybank, taking great pride in its corporate record for paying dividends.

52.    BB&T advertised and regularly touted itself, both to its employees and shareholders, as a "Dividend Aristocrat."  This prestigious designation was conferred by Standard & Poors on S&P 500 companies that had increased its dividend payments to shareholders every year for at least the last twenty-five (25) consecutive years.  The representation was clear: BB&T will pay ever increasing dividends into the future without fail.

53.    The strategy devised by Defendants to accomplish Mr. Maybank's investment objective of an on-going source of retirement income relied mainly upon their ill-advised, conflicted and unsustainable representation that the BB&T dividend was assured to increase.

54.    Defendants' recommendations that Mr. Maybank continue to hold his concentrated position in the BB&T stock and rely upon it as his primary source of income were

13

based upon express and implied representations that BB&T would continue without interruption to pay dividends at or above historic levels. Without the continued payment of this substantial dividend, Defendants knew, or should have known, that their flawed strategy was doomed to failure, all to Mr. Maybank's great expense and damages. Unbeknownst to Mr. Maybank, the strategy was a ticking time bomb that would destroy his financial well being if BB&T decreased its dividend and/or if the share price of BB&T stock was substantially reduced. These risks and others were not explained to Mr. Maybank and he had no knowledge of any potential problem until the first quarter of 2009. Even then he was not aware of the full scope of the problem until much later as the recklessness and imprudence of the strategy continued to emerge to reveal the unvarnished truth that Defendants had destroyed his life's work and life's savings through an ill-conceived, incompetently devised, recklessly risky, and inherently conflicted strategy that paid them handsome fees while destroying his financial well-being. In the preceding and following paragraphs some of the key facts of this doomed strategy are set forth. Others no doubt will be brought to light during the conduct of discovery in this sad, but entirely avoidable case of corporate greed, exploited trust, failed due diligence, incompetence, and gross mismanagement of Mr. Maybank's irreplaceable assets.

55.    The VPFC recommended and purchased by Defendants paid a "contractual dividend" based upon BB&T's dividend, and the up-front cost of the VPFC was calculated based upon BB&T's continuing payment of dividends at or above historic levels.

56.    BB&T and its employees, including Mahfood and Walters, represented to Mr. Maybank that they had special expertise in VPFCs, including the experience of conducting an exhaustive search of the marketplace for VPFCs to find the best available VPFC to advance the comprehensive investment goals and strategy established by BB&T.

14

57.     BB&T represented and recommended an exotic, complicated VPFC to Mr. Maybank as being suitable, appropriate, and prudent, as well as the best method to accomplish the following goals:

A.     Immediately generate funds to pay off outstanding debt;

B.     Significantly reduce the risk of a concentrated position and create a diversified portfolio;

C.     Avoid creating any taxable events during the life of the VPFC and any rollovers.

D.     Retain the benefit of gains made by the BB&T stock during the life of the VPFC and any rollovers;

E.     Protect against losses in the BB&T stock during the life of the VPFC and any rollovers;

F.     Protect and ensure the continued receipt of sure-fire, ever increasing dividends from the BB&T stock and any rollovers; and

G.     Continue all of the above-listed benefits into the future by rolling over the VPFC as required or desired.

58.     Defendants did not explain to Mr. Maybank the speculative and risky nature of the VPFC nor its associated fees and costs. Specifically, when this transaction was proposed, Defendants, in violation of their fiduciary, common law, statutory and contractual obligations, failed to provide Mr. Maybank with a complete description of the imbedded and upfront costs and fees associated with VPFCs, nor with a complete description of the investment risks involved in the transaction and proposed strategy, nor and most importantly with any viable, well researched, tried and true, and historically proven options or alternatives.

15

59.     Defendants did not disclose, explain, or otherwise provide Mr. Maybank with complete and accurate explanations of the negative implications of participating in a VPFC, including, but not limited to:

A.     The riskiness of the VPFCs;

B.     The unsuitability of VPFCs for a person in Mr. Maybank's position and station in life;

C.     The tax implications of the VPFCs;

D.     The full costs and fees associated with the VPFC, embedded or otherwise; and

E.     Mr. Maybank's options at the end of the VPFC and implications of those options on Mr. Maybank's BB&T stock position and dividend income, including early termination/roll-over costs.

60.     In reliance upon the advice provided by Defendants and at their direction, on or about August 11, 2006, Mr. Maybank executed a three year VPFC ("VPFC No.1") which by its terms would expire on August 11, 2009.

61.     In furtherance of the wealth management scheme designed by Defendants, Defendants first applied the proceeds of VPFC No.1 to satisfy Mr. Maybank's outstanding obligations, paying off the margin debt owed to BB&T subsidiary Scott & Stringfellow. The remaining proceeds were entrusted to Defendants for management ("Investment Account").

62.     Under the wealth management plan designed by Defendants, the stated reason for the purchase of the VPFC was to raise cash from which to create a diversified portfolio for Mr. Maybank. The BB&T stock associated with the VPFC already over-exposed Mr. Maybank to the risks inherent in traditional investments in marketable equity securities. Despite this

16

overexposure, Defendants nonetheless approved and implemented a strategy in the Investment Account involving a one hundred percent (100%) equity concentration in aggressive growth stocks. At no time did Defendants advise Mr. Maybank that the strategy implemented for him was unsuitable and risky and placed his life's savings in serious jeopardy of destruction. On the contrary, Defendants provided soothing assurance that the strategy was fully researched and designed to be prudent and suitable for his unique needs.

63.    Pursuant to the written agreement prepared by BB&T, the Bank and its Asset Management subsidiaries had complete discretion in and totally controlled the Investment Account, the trading activity in the Account, and any purported investment strategy. Believing that Defendants were acting as his fiduciaries and protecting his interests, Mr. Maybank followed their advice and did not question nor have reason to question that advice, which unbeknownst to him was imprudent, aggressive, uninformed, conflicted, negligent, reckless, and in breach of the contractual, fiduciary common law and statutory obligations Defendants owed to Mr. Maybank.

64.    Mr. Maybank did not receive the diversified portfolio promised by Defendants when they sold him the VPFC, but was instead doubly exposed to market risk, which was unsuitable and inappropriate for an investor of his age and with his need for a reliable source of income, both for his living expenses and to cover premium payments for policies held in the insurance trusts for which BB&T acted as trustee.

65.    Although Defendants recommended the VPFC purportedly as part of a comprehensive and holistic wealth management plan, they did not explain and Mr. Maybank did not understand the operation and/or limitations of the VPFC. Specifically, Defendants did not explain and Mr. Maybank did not understand that this highly complex derivative product would eventually force the investor to choose amongst several unattractive and very expensive options:

17

(1)    Tender a cash re-payment to the lender equal to the original value of the entire stock position, i.e., the amount of the forward cash loan disbursement, plus the large advance fee (or 100% of the stockholder's original stock position), in order to reclaim the pledged stock;

(2)    Relinquish ALL pledged stock to the lender, less the equivalent of any gains made by the stock during the life of the VPFC, thus permanently forfeiting both the stock and any future dividend income and triggering a tax liability ; or

(3)    Pay an additional advance fee and also face tax consequences due to the now realized stock sale to roll the original VPFC into a second VPFC, thus at least maintaining the right to receive dividends from the pledged stock.

66.    Defendants knew or should have known that the investment strategy they devised and implemented effectively eliminated both of the first two options. As a retired person, Mr. Maybank had no source of outside funds from which to repay over $9.3 million in original VPFC proceeds and fees, thus placing the first option beyond his reach. Nor could Mr. Maybank relinquish the pledged stock – since Defendants failed to create the promised diversified portfolio upon which their original recommendation was premised leaving Mr. Maybank with only one remaining financial asset, i.e., the still concentrated position in now reduced value BB&T stock and its substantially reduced dividend payment for his primary source of retirement income. Thus, Defendants knew, although Mr. Maybank did not, that their investment strategy locked him into an endless, expensive, damaging cycle from which there was no escape.

67.    Defendants knew or should have known, but did not advise Mr. Maybank, that his only option would be to continue to roll over the VPFC. This remaining "option" had the

potential to lock Mr. Maybank into paying more and more fees, but the substantial fees and tax liabilities triggered by the subsequent roll-overs would further deplete the amount available for investment. Repetition of this cycle would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing. In short, he was placed into a financial death spiral by Defendants' negligent, reckless, grossly negligent, imprudent and incompetent advice and actions. Further, as a result of Defendants' failure to explain the operation of the VPFC and its inherent risk and enormous cost, Mr. Maybank was completely unaware that his meaningful options as well as his financial well-being had been sabotaged, destroyed and hugely damaged.

68.     With financial markets in turmoil, in or about January 2009, in anticipation of VPFC No. 1 terminating in August 2009, Mr. Maybank reiterated to Defendants his need to meet his investment objective of on-going retirement income for the remainder of his life.

69.     Defendants knew (but did not explain to Mr. Maybank) that Mr. Maybank could not afford to retain the BB&T stock as an income source by buying out VPFC No. 1, as such a cash settlement would have required repayment of over $9.3 million. This amount was well beyond the means of a retired person like Mr. Maybank, particularly since a substantial portion of the original proceeds of VPFC No. 1 was no longer available because it had been used to retire debt owed to a BB&T subsidiary.

70.     Defendants also knew (but did not explain to Mr. Maybank) that their failure to create from the proceeds of VPFC No. 1 the promised diversified portfolio capable of generating retirement income also prevented Mr. Maybank from simply relinquishing his BB&T stock, as the BB&T stock was then essentially his only source of income.

71.     Defendants knew (but did not explain to Mr. Maybank) that as a result of their own negligent, grossly negligent, reckless and incompetent advice and misconduct relating to

19

VPFC No. 1, the nature and extent of which was unknown to Mr. Maybank, combined with the mismanagement of the Investment Account, that Mr. Maybank's only option was a rollover of VPFC No. 1. Defendants therefore recommended, approved and implemented the rollover of VPFC No. 1 into another complex derivative ("VPFC No. 2"), as the best way to accomplish Mr. Maybank's continuing investment objective of generating retirement income. Defendants knew, however, or should have known, that their conflicted, reckless, grossly negligent advice, misconduct and mismanagement had trapped Mr. Maybank into an endless cycle of rollovers until he was financially ruined and unable to pay the cost of another rollover (the death spiral), knowledge that they deliberately withheld from Mr. Maybank.

72. In recommending and preparing the roll-over transaction, Defendants failed to advise or in any way inform Mr. Maybank of the magnitude of the fees and costs involved in the premature termination/early roll-over of VPFC No.1 prior to its scheduled termination date or of the tax consequences of doing so.

73. Not until **after** the VPFC No.1 - VPFC No.2 rollover transaction was executed, did BB&T disclose to Mr. Maybank that he would incur the outrageous sum of almost $1.3 million in costs and fees for the rollover into VPFC No.2.

74. The reason for the rollover of VPFC No.1 into VPFC No.2 was to protect Mr. Maybank's on-going ability to receive dividend income, which continued to be projected as ever increasing. During the two year life of VPFC No.2, Mr. Maybank would have received dividends of approximately $800,000, had BB&T continued to pay dividends at the then historic rate of 47¢/share/quarter. Therefore, Mr. Maybank's fiduciaries advised and sold a product for which Mr. Maybank subsequently paid an upfront fee of nearly $1.3 million to receive approximately $800,000 in dividend income spread over two years. This advice was

inexplicably incompetent. From the outset, the foundation of Defendants' ill conceived strategy was an ever increasing dividend payment from BB&T stock. That foundation abruptly changed in mid-2009 when BB&T drastically cut its dividend. Mr. Maybank only received dividend income of approximately $230,000 (about 70% less than projected) during the life of VPFC No. 2, so that the rollover of the VPFC did not even accomplish the limited goal of protecting Mr. Maybank's receipt of dividend income.

75.    In or about late February or early March of 2009, Defendants informed Mr. Maybank that, the VPFC roll-over may have triggered an ordinary income tax liability of up to $1 million.

76.    As a result of Defendants' incompetent, negligent, grossly negligent, reckless and imprudent "wealth management," Mr. Maybank suffered losses in the unsuitably managed Investment Account, paid cash calls of approximately $1,700,000, incurred substantial tax liabilities, forfeited valuable insurance policies, and incurred fees and costs associated with subsequent VPFC roll-overs incurred in the financial death spiral into which he was placed by Defendants.

## FOR A FIRST CAUSE OF ACTION
### Breach of Contract

77.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this First Cause of Action.

78.    Upon the opening of the Mr. Maybank's account with the BB&T Trust Department, and then as the account began to be managed by Defendants, BB&T entered into both express agreements and implied agreements with the Mr. Maybank, including the BB&T

21

Wealth Management Agreement. These agreements constituted contracts between the Mr. Maybank and BB&T (hereinafter "the Agreements").

79.    As a customer of BB&T and also pursuant to the Wealth Management Agreement between the parties, Mr. Maybank had contracts with BB&T, pursuant to which BB&T owed Mr. Maybank a duty to advise him honestly, fairly, competently, and prudently, and in accordance with his needs, goals and best interests.

80.    In addition, South Carolina law further implies a duty of good faith and fair dealing into every contract, including the Wealth Management Agreement and the VPFCs arranged and recommended by BB&T.

81.    Defendants breached their Agreements with Mr. Maybank in one or more of the following particulars:

> A.    Defendants placed their own interests ahead of Mr. Maybank's by creating, recommending, and advocating a risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, negligent, and reckless for Mr. Maybank;

> B.    Defendants placed their own interests ahead of Mr. Maybank's thus treating him as a profit center and cross-selling opportunity, instead of as their fiduciary principal;

> C.    Defendants repeatedly advocated and recommended risky derivative products that failed to meet Mr. Maybank's investment objectives and needs while guaranteeing substantial profits for Defendants;

> D.    Defendants failed to advise Mr. Maybank of the patent conflicts of interest inherent in their promotion of a wealth management and investment

22

strategy premised upon his holding an over-concentrated position of BB&T stock;

E.  Despite knowing that their plan was speculative, risky and unsuitable, Defendants nonetheless created and recommended to Mr. Maybank a wealth management and investment plan based on a speculative and costly VPFC without advising him of its known speculative nature, nor of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.  Defendants created a multi-level fee structure when they advised Mr. Maybank to purchase a risky derivative product (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mr. Maybank's;

G.  Defendants knew, but failed to disclose to Mr. Maybank, that their "wealth management" strategy would trap him into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing;

H.  Defendants knew of, but failed to disclose to Mr. Maybank their own financial interests in recommending speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

23

I.      Defendants failed to ascertain or understand the nature and type of securities it promoted to Mr. Maybank and whether or not they were suitable for him at his age and position entering into retirement;

J.      Defendants twice advised Mr. Maybank to invest his funds in VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mr. Maybank; and/or

K.      Defendants failed to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction.

82.     Defendants' acts and omissions constitute failures to abide by the terms of the Agreements, and constitute breaches of the Agreements entered into with Mr. Maybank. Mr. Maybank has been directly and proximately damaged as a result of Defendants' breaches.

83.     Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) attorneys' fees, (4) costs, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

## FOR A SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

84.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Second Cause of Action.

85.     Mr. Maybank expressly sought the safety and security of fiduciary management for his irreplaceable assets, because in his retirement he intended to delegate investment responsibilities and the management of his assets to professional fiduciaries and Defendants agreed to act as his fiduciaries. Defendants, who were already serving as trustees over his insurance trusts, undertook to provide fiduciary wealth management and investment advisory

24

services to Mr. Maybank and also agreed to serve as the personal representative of his estate after his death. Such relationships are fiduciary under South Carolina law and were recognized as such by Defendants in the BB&T Code of Ethics.

86. Mr. Maybank's relationship with Defendants involved a relationship of the utmost trust and confidence because of the parties' preexisting relationships, the nature of the transactions in question, and the parties' Agreements. This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants to act with perfect good faith and undivided loyalty in the interests of Mr. Maybank.

87. As the fiduciaries of Mr. Maybank, Defendants owned a clear duty to Mr. Maybank of undivided loyalty, absolute faithfulness, and a duty to exercise due care and diligence with respect to the wealth management and control of Mr. Maybank's investments, assets and accounts.

88. With this fiduciary relationship also came the duties and obligations to keep Mr. Maybank fully informed of all facts pertinent to any recommended investments (including but not limited to the VPFCs) which BB&T arranged for Mr. Maybank, to make full disclosure of all facts that could materially affect his financial well-being, to avoid conflicts of interests where the Bank could or did place its interests and its affiliates' interests above Mr. Maybank's interests, to promptly disclose to Mr. Maybank any actual or potential conflict of interest, and to exercise reasonable care, diligence, and prudence in the performance of its duties.

89. Mr. Maybank entrusted his assets to Defendants, who agreed to accept them and to act as his fiduciaries in providing wealth management and investment advice. Defendants breached their fiduciary duties in one or more of the following particulars:

25

A.     Defendants placed their own interests ahead of Mr. Maybank's by creating, recommending, and advocating a risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, negligent, and reckless for Mr. Maybank;

B.     Defendants placed their own interests ahead of Mr. Maybank's thus treating him as a profit center and cross-selling opportunity, instead of as their fiduciary principal;

C.     Defendants repeatedly advocated and recommended risky derivative products that failed to meet Mr. Maybank's investment objectives and needs while guaranteeing substantial profits for Defendants;

D.     Defendants failed to advise Mr. Maybank of the patent conflicts of interest inherent in their promotion of a wealth management and investment strategy premised upon his holding an over-concentrated position of BB&T stock;

E.     Despite knowing that their plan was speculative, risky and unsuitable, Defendants nonetheless created and recommended to Mr. Maybank a wealth management and investment plan based on a speculative and costly VPFC without advising him of its known speculative nature, nor of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.     Defendants created a multi-level fee structure when they advised Mr. Maybank to purchase a risky derivative product (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for

26

which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mr. Maybank's;

G.    Defendants knew, but failed to disclose to Mr. Maybank, that their "wealth management" strategy would trap him into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing;

H.    Defendants knew of, but failed to disclose to Mr. Maybank their own financial interests in recommending speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

I.    Defendants failed to ascertain or understand the nature and type of securities it promoted to Mr. Maybank and whether or not they were suitable for him at his age and position entering into retirement;

J.    Defendants twice advised Mr. Maybank to invest his funds in VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mr. Maybank; and/or

K.    Defendants failed to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction.

90.    In one or more of the preceding particulars, Defendants acted with imprudence, negligence, gross negligence, recklessness, willful misconduct, fraudulent intent, and bad faith and thereby breached the fiduciary duties owed to Mr. Maybank, proximately causing him to suffer damages.

27

91.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A THIRD CAUSE OF ACTION
### Negligence, Gross Negligence, Recklessness and/or Willful and Wanton Misconduct

92.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Third Cause of Action.

93.    Defendants had and owed a clear duty to Mr. Maybank to exercise reasonable care, skill, diligence and prudence under the circumstances presented by Mr. Maybank's unique situation and investment objectives.

94.    Defendants breached their duty to Mr. Maybank to exercise reasonable care, skill, diligence and prudence under the circumstances and such breaches caused Mr. Maybank to suffer damages.

95.    Defendants' actions and inaction as set forth herein were negligent, grossly negligent, reckless, willful and wanton, knowing and/or intentional.

96.    Defendants' conduct in the recommendation and execution of their wealth management strategy constituted imprudence, negligence, gross negligence, recklessness, bad faith and/or willful misconduct in one or more of the following particulars:

A.    Defendants placed their own interests ahead of Mr. Maybank's by creating, recommending, and advocating a risky and flawed wealth

28

management and investment strategy that was imprudent, aggressive, uninformed, conflicted, negligent, and reckless for Mr. Maybank;

B.    Defendants placed their own interests ahead of Mr. Maybank's thus treating him as a profit center and cross-selling opportunity, instead of as their fiduciary principal;

C.    Defendants repeatedly advocated and recommended risky derivative products that failed to meet Mr. Maybank's investment objectives and needs while guaranteeing substantial profits for Defendants;

D.    Defendants failed to advise Mr. Maybank of the patent conflicts of interest inherent in their promotion of a wealth management and investment strategy premised upon his holding an over-concentrated position of BB&T stock;

E.    Despite knowing that their plan was speculative, risky and unsuitable, Defendants nonetheless created and recommended to Mr. Maybank a wealth management and investment plan based on a speculative and costly VPFC without advising him of its known speculative nature, nor of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.    Defendants created a multi-level fee structure when they advised Mr. Maybank to purchase a risky derivative product (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mr. Maybank's;

G.     Defendants knew, but failed to disclose to Mr. Maybank, that their "wealth management" strategy would trap him into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing;

H.     Defendants knew of, but failed to disclose to Mr. Maybank their own financial interests in recommending speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

I.     Defendants failed to ascertain or understand the nature and type of securities it promoted to Mr. Maybank and whether or not they were suitable for him at his age and position entering into retirement;

J.     Defendants twice advised Mr. Maybank to invest his funds in VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mr. Maybank; and/or

K.     Defendants failed to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction.

97.     In one or more of the preceding particulars, Defendants acted with imprudence, negligence, gross negligence, recklessness, willful misconduct, fraudulent intent, and/or bad faith and thereby breached the common law duties of care owed to Mr. Maybank, proximately causing him to suffer damages.

98.     Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the bad faith, gross negligence,

30

recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A FOURTH CAUSE OF ACTION
### Breach of Contract, Accompanied By Fraudulent Act

99.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fourth Cause of Action.

100.    As a customer of BB&T and pursuant to the Wealth Management Agreement, Mr. Maybank had Agreements with Defendants, pursuant to which Defendants owed him a duty of good faith and fair dealing and a duty to advise him honestly, fairly and in accordance with her needs, goals and best interests.

101.    Defendants' fraudulent misconduct, actions and inactions, as alleged in this Complaint, constitute a failure to abide by the terms of defendants' contracts with Mr. Maybank, including the Wealth Management Agreement, and constitute a breach of these agreements entered into with Mr. Maybank.  Mr. Maybank has been directly and proximately damaged as a result of Defendants' breaches.

102.    Moreover, in breaching the Agreements with Mr. Maybank, Defendants exhibited a fraudulent intent relating to those breaches.

103.    Defendant's breaches of the Agreements were accompanied by fraudulent acts and/or omissions on the part of Defendants in one or more of the following particulars:

A.    Defendants breached the Agreements when their strategy based upon the retention of the concentrated position in BB&T stock and execution of VPFCs failed to protect Mr. Maybank's investment portfolio and resulting

31

net worth after representing to Mr. Maybank that they would provide such protections and then, through the acts and omissions alleged in this Complaint, attempted to disguise the shortcomings of the strategy known to Defendants by misrepresenting and/or failing to disclose to Mr. Maybank accurate and truthful information related to the costs and risks of the strategy based on the VPFCs.

B.    Defendants breached the Agreements by placing their own interests ahead of Mr. Maybank's by creating, recommending, and executing a risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, negligent, and reckless, while assuring Mr. Maybank that the strategy was instead defensive, prudent and suitable for him.

C.    Defendants breached the Agreements by repeatedly recommending and selling risky derivative products which guaranteed substantial profits for Defendants but failed to meet Mr. Maybank's investment objectives and needs, while assuring Mr. Maybank that these products were defensive, prudent and suitable for him.

D.    Defendants breached the Agreements by repeatedly recommending and executing wealth management and investment schemes premised upon Mr. Maybank's holding of an over-concentrated position of BB&T stock which advanced Defendants' interests but failed to meet Mr. Maybank's investment objectives, while repeatedly assuring Mr. Maybank that this strategy was defensive, prudent and suitable.

32

E.    Defendants breached the Agreements by recommending and executing a wealth management and investment plan based on VPFCs known to Defendants to be speculative and costly, while Defendants repeatedly assured Mr. Maybank that this strategy was defensive, prudent and suitable and simultaneously failed to advise him of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.    Defendants breached the Agreements by providing advice which was tainted with the patent conflicts of interest inherent in their promotion of a wealth management and investment strategy based upon the continued holding their own company's stock, while failing to disclose this conflict of interest;

G.    Defendants breached the Agreements by recommending and selling securities and investment products as being suitable for Mr. Maybank, when in fact they knew that such securities and investment products were not suitable for Mr. Maybank at his age and position entering into retirement;

H.    Defendants breached the Agreements by representing to Mr. Maybank that VPFCs were reasonable and sound vehicles by which Mr. Maybank could attain his investment goals, while providing liquid funds to pay off his debts, when they knew or should have known that this strategy was doomed to failure and that the undisclosed information was material to Mr. Maybank;

33

I.    Defendants breached the Agreements by recommending a roll-over the of the VPRC, while failing to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction, when they knew or should have known that the undisclosed information about fees was material to Mr. Maybank; and/or

J.    Defendants breached the Wealth Management Agreement when they failed to create the diversified portfolio promised to Mr. Maybank and then, through the acts and omissions alleged in this Complaint, attempted to disguise that failure by misrepresenting and/or failing to disclose to Mr. Maybank accurate and truthful information related to the non-diversified nature of their investment strategy.

104.    As a direct, consequent and proximate result of Defendants' breach of contract accompanied by fraudulent acts, Mr. Maybank has suffered injury all in direct violation of the laws of the State of South Carolina.

105.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the fraudulent acts accompanying the breaches of the Agreements, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, (6) and such other relief as is just, equitable, and proper.

## FOR A FIFTH CAUSE OF ACTION
### (STATE SECURITIES FRAUD)

106.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fifth Cause of Action.

34

107.    In the course of their fiduciary duties to Mr. Maybank, Defendants recommended and advised that he enter into unsuitable transactions involving *inter alia*, the VPFCs and the Investment Account, and in so doing, misrepresented the risk of the products and Investment Account to Mr. Maybank and thereby defrauded him as is set forth in more detail in ¶¶ 82, 90, 96 and 103 of this Complaint.

108.    Defendants also failed to disclose to Mr. Maybank the gross conflict of interest existing when they advised him about the management and retention of their own company's stock as is set forth in more detail in ¶¶ 82, 90, 96 and 103 of this Complaint.

109.    The actions of Defendants were wrongful, fraudulent, and in violation of S.C. Code Ann. §§ 35-1-501, -502, and -509 (Supp. 2010), and the regulations regulating broker conduct established thereunder.

110.    As a consequent and proximate result of the fraud perpetrated by Defendants, Mr. Maybank suffered substantial damages.

111.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) costs, (3) attorneys' fees, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable and proper.

### FOR A SIXTH CAUSE OF ACTION
#### (South Carolina Unfair Trade Practices)

112.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Sixth Cause of Action.

113.    To the extent that the VPFCs or any other product or service recommended or sold to or performed for Mr. Maybank are not considered "securities" under South Carolina law,

Defendants engaged in an unfair method of competition and/or an unfair or deceptive act or practice in the conduct of trade or commerce.

114.    Defendants' unfair acts and practices included recommending and implementing an investment scheme which involved the retention of a large concentrated position of Defendant's own stock, the purchase of a complex derivative product without disclosing either the risks or expenses thereof, the receipt of client assets for continued management without creating the promised diversified portfolio, all with the knowledge that Defendants' "wealth management" strategy would trap Mr. Maybank into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving him with nothing, as is set forth in more detail in ¶¶ 82, 90, 96 and 103 of this Complaint.

115.    The unfair and deceptive acts and practices committed by Defendant in the conduct of its trade and commerce have a potential for repetitive impact on the public interest.

116.    Such unfair acts and practices constitute a violation of the Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.* (1976) (as amended).

117.    Insofar as they do not involve securities, Defendants unfair acts and practices described above constituted willful, intentional, and knowing violations of the Unfair Trade Practices Act.

118.    Mr. Maybank has suffered damages as a result of the aforementioned unfair and deceptive acts and practices of Defendants in that he has suffered losses in the unsuitably managed Investment Account, paid cash calls of approximately $1,700,000, incurred substantial tax liabilities, forfeited valuable insurance policies, and incurred fees and costs associated with

36

subsequent VPFC roll-overs incurred in the financial death spiral into which he was placed by Defendants.

119.    Mr. Maybank is entitled to a judgment against Defendant BB&T for actual and consequential damages, treble damages and attorneys' fees pursuant to the Unfair Trade Practices Act, costs, and such other further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** having set forth his claims, Plaintiff prays for judgment against Defendants as follows:

a.      For actual damages;

b.      For consequential damages;

c.      For punitive damages in an amount to be determined by the finder of fact;

d.      For treble damages pursuant to S.C. Code Ann. § 39-5-10 *et seq.*;

e.      For prejudgment interest at the highest legal rate;

f.      For the costs of this action;

g.      For reasonable attorneys' fees; and

h.      For such other and further relief as is just, equitable, and proper.

[SIGNATURE PAGE FOLLOWS]

37

Respectfully submitted,

*Mitchell Willoughby*

Mitchell Willoughby, Esquire
Elizabeth Zeck, Esquire
Chad Johnston, Esquire
**WILLOUGHBY & HOEFER, P.A.**
930 Richland Street
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300
mwilloughby@willoughbyhoefer.com
ezeck@willoughbyhoefer.com
cjohnston@willoughbyhoefer.com

Attorneys for the Francis P. Maybank

December 22, 2011
Columbia, South Carolina

38

# EXHIBIT A

# BB&T Wealth Management Agreement

This Wealth Management Agreement ("Agreement") is made and entered into this 23rd day of August, 2006, by and among Branch Banking and Trust Company ("Bank"), BB&T Asset Management, Inc. ("Investment Advisor"), and the client whose name appears at the end of this Agreement ("Client").

Bank, through its Wealth Management Division, will act as wealth manager (the "Wealth Manager") of those assets of Client designated to be subject to this Agreement (the "Account"). Investment Advisor will act as Client's investment advisor with full investment discretion over the Account. Bank, through its Trust Division, will act as custodian of the Account (the "Custodian").

## I.    Service of Bank as Wealth Manager

As Wealth Manager, Bank shall (i) gather information from the Client regarding the Client's investment objectives, risk tolerance and investment horizon, tax status, financial situation and needs, (ii) make recommendations to the Client regarding an investment program and investment guidelines for the Account and (iii) coordinate and supervise the services of the Investment Advisor and the Custodian for the Account. Personnel from Bank's Wealth Management Division shall meet periodically and communicate with the Client regarding the Account and shall be available during business hours to answer questions from the Client regarding the Account.

When deemed appropriate, and in the best interest of the Client, Bank is hereby granted authority, subject to prior consent of the client on a case-by-case basis after review of more complete risk disclosure and related information on each proposed investment or transaction, to enter into, invest in, purchase, close-out, redeem or sell for the Account: interests in private investment funds, whether in limited partnership, limited liability company, trust, corporate or other form, that are exempt from registration under the Investment Company Act and the interests in which are not registered under the Securities Act of 1933; privately-negotiated swaps, options, collars and similar derivative contracts; and public or privately offered notes the return on which is linked to an index or basket of securities or other assets or contracts ("Structured Notes"). Client recognizes that additional fees will be incurred when using these alternative investment products and strategies. A more complete description of these fees is included in the disclosure materials for each alternative investment product that will be provided to Client at the time a transaction is proposed for Client's account. Client understands that some of these investments present conflicts of interest to Bank due to fee structures and use of proprietary products, and hereby waives such conflicts. Client recognizes that alternative investment products involve a number of investment risks beyond those found in traditional investments in marketable debt and equity securities. A more complete description of these risks is included in the disclosure materials for each alternative investment product that will be provided to Client at the time a transaction is proposed for Client's account.

## II.    Service of Investment Advisor

A.    Investment Authority.

1.    In consultation with Investment Advisor and Wealth Manager, Client will establish investment objectives (Appendix A) for investing the assets in the Account.

1

2.  Within those established objectives and subject to any investment restrictions that Client has notified Investment Advisor of in writing, Investment Advisor is hereby granted complete discretion to purchase or sell the assets in the Account at any time and in any amount without further authorization from Client and to invest and reinvest the assets of the Account in debt, equity and other securities and other assets, investments and contracts, to borrow and lend securities for the Account, and write covered call option contracts. Further, Investment Advisor is hereby granted complete discretion to select brokers and dealers through which to execute transactions for the Account.

3.  Investment Advisor is specifically authorized to invest in among other types of securities and investments, mutual funds registered under the Investment Company Act of 1940, and private investment funds that are exempt from registration, including mutual funds and private investment funds to which Investment Advisor or an affiliate provides investment management custody or other services and for which it receives compensation or with which it has in common officers, directors or employees. Client consents to the deposit of cash from the Account in a deposit account with Bank, including short term deposit of cash balances or longer term deposit in certificates of deposit or other bank deposit accounts or investment in money market mutual funds including funds advised by Investment Advisor or others. Client recognizes that the relationship between Investment Advisor and its affiliates may present a conflict of interest in making these investments or deposits for the Account and waives any objection to such conflicts of interest.

4.  Investment Advisor shall not have custody or possession of Client's assets at any time, and Investment Advisor will not have the right to withdraw assets from the Account, other than to direct Custodian to settle portfolio transactions for the Account and pay fees and expenses as provided in this Agreement.

B.  <u>Investment Risks</u>.  Client acknowledges that:

1.  No representation has been made by Bank or Investment Advisor that success can be assured in every transaction or that the Account will prove profitable.

2.  The investments of the Account in securities are not deposits and are not insured by any government agency as explained in Appendix B.

C.  <u>Research Credit from Brokerage Commissions</u>.  Client authorizes Investment Advisor to allocate commission business on purchases and sales of equity securities in the Account in return for various research, brokerage, accounting, financial and market information and services beneficial to Investment Advisor in advising the Account.

D.  <u>Agency Cross Transactions</u>.  Client understands that Investment Advisor may from time to time, determine in Client's best interest that a security should be sold from the Account to, or purchased for the Account from, an affiliate of Investment Advisor that is acting as a broker for the account of one or more of Investment Advisor's or an affiliate's other customers. Due to the potential conflict of interest inherent in such "agency cross transactions," in which Investment Advisor or an affiliate may receive commissions from and have a potentially conflicting division of loyalties and responsibilities regarding the parties to the transaction, Client understands that Investment Advisor will not engage in any such transactions for the Account absent Client's prospective consent. Accordingly, Client has indicated Client's consent or lack of consent to such transactions by initialing the applicable option below:

*ŞM*

Client hereby consents to Investment Advisor s executing agency cross transactions for the Account. Client understands that Client may cancel this consent at any time.

_____ Client does NOT consent to Investment Advisor's executing agency cross transactions for the Account.

E.   Voting of Proxies.   Client understands that to the extent Client holds equity securities or certain mutual funds in the Account, Client may be entitled to vote proxies in connection with shareholder votes conducted by the issuers of such securities or mutual funds. Client may either vote such proxies or authorize Investment Advisor to vote such proxies on behalf of Client. Client may also choose to vote certain issuers' proxies -- such as the proxies of BB&T Corporation (which owns Investment Advisor), -- and to authorize Investment Advisor to vote all other proxies on behalf of Client.

Client has indicated Client's choice as to whether to authorize Investment Advisor to vote proxies on behalf of Client by initialing the applicable option below:

_____ Client  hereby states that Client wishes to be responsible for voting Client's proxies and accordingly does NOT give Investment Advisor authority to vote such proxies on behalf of Client proxies.

*FM*

Client hereby authorizes Investment Advisor to vote all proxies on behalf of Client.

_____ Client hereby states that Client wishes to be responsible for voting Client's proxies of BB&T Corporation, and accordingly does NOT give Investment Advisor authority to vote such proxies on behalf of Client, but Client hereby authorizes Investment Advisor to vote all other proxies on behalf of Client.

### III.   Service of Bank as Custodian

A.   Custody of the Account.

1.   As Custodian, Bank shall hold in custody and safe-keep on Client's behalf all securities and other assets in the Account from time to time delivered to Bank's Trust Division or received by Bank under the terms of this Agreement. All assets in the Account shall be held or disposed of by Custodian pursuant to instructions of Client or Investment Advisor. Client may make additions to the Account that are acceptable to Bank.

2.   Written instructions and directions will be personally signed by Client or Investment Advisor. Custodian in its discretion may accept instructions and directions from Client or Investment Advisor when given orally by telephone, mail, electronic transmissions, facsimile transmission, or other commercially reasonable means, which Custodian believes to be genuine.

3.   Custodian is authorized to execute on behalf of Client any endorsements, assignments, stock or bond powers or other instruments of transfer required for the exercise of its duties under this Agreement and is hereby appointed attorney-in-fact for the Client for such purposes. Client hereby ratifies and confirms all that said attorney-in-fact shall do or cause to be done pursuant to this appointment.

3

4.   Unless directed in writing, Custodian will not provide Client confirmations of trades placed through a brokerage firm. Trade information is set forth in Client statements.

5.   Custodian may ☐ or may not ☒ release the identity of Client to an issuer that requests such information pursuant to the Shareholder Communications Act of 1985, and the rules of the SEC issued under it, for the specific purpose of direct communications between such issuer and Client. IF NO BOX IS CHECKED, CUSTODIAN SHALL RELEASE SUCH INFORMATION UNTIL IT RECEIVES A CONTRARY INSTRUCTION FROM CLIENT.

B.   Receipts of Income and Principal.

1.   Custodian is authorized to collect all income on the assets in the Account on Client's behalf. Custodian will also receive any principal payments, including the proceeds of called, tendered or matured securities and the proceeds of sale of securities that are sold for the Account.

2.   Custodian may give provisional credit to the Account based on the anticipated delivery date of principal or income payments or settlement of transactions. If the anticipated payments are not received or are delayed past the anticipated date, Client understands that Custodian may debit the Account for the provisionally credited amount pending actual receipt by Custodian.

C.   Statements. Custodian will send to Client a monthly ☒ or quarterly ☐ statement showing the beginning value of the Account, all transactions and payments in the Account during the period, and the positions in the Account as of the end of the period covered by the statement. Client agrees to review each Account statement upon receipt and understands that each Account statement will be deemed conclusive if Client does not object to it in writing within 30 days of the date of the statement. Custodian and Investment Advisor each nonetheless reserves the right and intends to correct any demonstrable errors (e.g. clerical, computer-related, or valuation errors) at any time. All statements sent to Client at the address provided under this Agreement shall be deemed to have been delivered to Client within five days of mailing whether actually received or not.

D.   Withdrawal of Assets by Client. Client may withdraw securities or funds in the Account at any time upon direction or receipt signed by Client, subject to the payment of any fees due to Bank or Investment Advisor, payment of the Account expenses incurred, and subject to amounts under lien, serving as collateral or needed to settle pending transactions for the Account, or as otherwise required by law to be withheld.

E.   Administrative Powers. Custodian is authorized to perform such other acts incidental to its duties under this Agreement as Custodian, in its discretion, deems appropriate, including the authority: (i) to register and hold securities or other property in the name of a nominee or in any other form without disclosure of this Agreement or to hold the same unregistered in such form that they will pass by delivery; (ii) to employ persons or entities to assist Custodian, including agents and brokers, including Custodian's own affiliates; (iii) to comply with orders issued or process entered by any court with respect to the Account and the assets in the Account; (iv) to execute on behalf of Client any declarations, affidavits, certificates of ownership, or federal income tax ownership certificates as may be required with respect to any assets held in the Account; (v) to deliver and receive securities, cash and other Account assets and portfolio contracts to and from broker-dealers, investment funds, banks and other counterparties in order to enter into or settle portfolio transactions and investments for the

4

Account, and to pledge Account assets or deliver out Account assets as collateral to secure investment portfolio obligations of the Account, as instructed by Investment Advisor.

II.    **General.**

A.    Compensation.    Client understands that compensation for services to Bank and Investment Advisor are in accordance with Appendix C or as modified by written agreement with Client. Bank may modify Fee Schedule from time to time by written notice to Client. Fees received by Investment Advisor or an affiliate for investment management, custody or other services provided to mutual funds or private investment funds in which the Account is invested or for other services not contemplated by this Agreement, such as acting as broker, shall be in addition to and not in lieu of fees for serving as Investment Advisor.

B.    Assignment.    No assignment of this Agreement shall be made by any party without the other parties' written consent. However, Client shall be deemed to consent to continuation of this Agreement after a change in control of Bank or Investment Advisor (a change in control of Investment Advisor may be deemed to be an "assignment" for purposes of the federal Investment Advisers Act) if Client has been provided written notice of the change-in-control not less than 45 days prior to the change-in-control and Client has not objected in writing, to the address specified in the notice, within such period, to continuation of this Agreement. This Agreement shall inure to the benefit of and bind the parties' respective permitted successors and assigns.

C.    Amendment.    Client understands that, from time to time, Bank and Investment Advisor may seek to amend this Agreement by providing Client with 30-day notice of the proposed amendment. Client agrees that any such amendment will be deemed accepted by Client if Client continues to maintain the Account following the 30-day notice period. This Agreement may also be amended by mutual written consent of the parties.

D.    Term and Termination. This Agreement may be terminated by any party by the giving of thirty (30) days written notice to any non-terminating party. Such written notice shall be either sent via certified mail, return receipt requested, or hand-delivered to the address of the party as set forth herein unless a substitute address has been provided to the other party in writing. Written notice by the terminating party shall be deemed received by the non-terminating party upon physical delivery either by mail or by hand. Upon termination of this Agreement, Investment Advisor shall perform no functions whatsoever with respect to the management of the Account except those functions specifically authorized by Client in writing and, further, management of the Account shall be the sole responsibility of Client.

In any event, within five (5) business days after execution by all parties, client may terminate this agreement, without penalty or charge, via written notice to advisor.

E.    Death or Incompetence of Client. In the event that Client should die or become incompetent, Investment Advisor and Bank's authority to act pursuant to the terms of this Agreement shall continue until such time as Investment Advisor and Bank receive written notice of Client's death or incompetence from Client's legal representative.

F.    Limitation of Liability and Indemnification.    Client agrees:

1.    Bank and Investment Advisor shall not be liable with respect to their services under this Agreement except for any loss attributable to their negligence or willful misconduct. In no event shall Bank or Investment Advisor be liable for any incidental, indirect, special, consequential or punitive damages.

2.   Bank and Investment Advisor shall not be liable to Client for any act or omission of any broker-dealer, issuer of securities or contracts held in the Account, or other third party, and do not assume responsibility for the accuracy of information furnished to them by Client, an issuer of securities, or by any other person upon whom they reasonably rely.

3.   Bank, Investment Advisor and their affiliates shall not be liable to Client as a result of actions or omissions in respect of portfolio companies taken in the other capacities in which Investment Advisor, Bank or their affiliates operate, or failure to trade in securities for the Account while precluded from doing so by insider trading laws, Investment Advisor or Bank internal policies or when precluded from using or sharing confidential information regarding the portfolio companies with the investment team that manages and administers the Account.

4.   Client shall reimburse, indemnify and hold Bank and Investment Advisor harmless from any and all liability, loss, claim, damage or expense, including attorney's fees and costs, resulting from their exercise of or failure to exercise any authority or power granted to them under this Agreement (except for negligence or willful misconduct) or from claims of third parties including claims for taxes or other governmental charges.  Bank is authorized to hold or to apply the property, including cash, in the Account for such indemnification or reimbursement.

5.   Bank and Investment Advisor shall not be obligated to take any legal action or commence any proceeding in connection with the Account.

6.   Bank and Investment Advisor have authority not to execute any transactions which they believe may violate applicable statutes or subject them to loss or liability.

7.   Certain federal and state securities laws may impose liabilities under certain circumstances on persons who act in good faith, and nothing herein shall in any way constitute a waiver or limitation of any rights which Client may have under any such applicable law if under applicable law they cannot be waived by contract.

G.   Acknowledgment of Receipt, Integration and Severability.

1.   Client acknowledges receipt of a copy of Investment Advisor's most recent ADV Form, Part II and a copy of this Agreement and the Appendices to it.

2.   The terms and conditions contained in this Agreement constitute the entire agreement of the parties concerning its subject matter and supercede all prior communications, representations, negotiations or agreements concerning Client's engagement of Bank to provide wealth management and custody services and Investment Advisor to provide investment advisory services.

3.   If any provision of this Agreement is held illegal or unenforceable in a judicial proceeding, such provision shall be severed from this Agreement and shall be inoperative and the remainder of the Agreement shall remain binding on the parties.

H.   Applicable Law.  This Agreement will be governed by the internal laws of the State of SC  without reference to principles of conflict of laws.

I.   Notices.  Any notices hereunder shall be in writing, duly signed by the party giving such notice, and shall be effective when received by the party to whom addressed at the address indicated below or to such other address as a party may designate in writing to the other party.

If to Bank as Wealth Manager or Custodian:

Branch Banking and Trust Company of SC
  416 East North Street
  Greenville, SC 29601
  Attention:  Anthony Mahfood

If to Client, at the address set forth below:

  30 Meeting Street
  Charleston, SC  29401
  Attention:Francis P. Maybank

If to Investment Advisor:

BB&T Asset Management, Inc.
  416 East North Street
  Greenville, SC 29601
  Attention:  Kris Kapoor

Name of Account   MA Francis P. Maybank                    Account Number *1752003949*

*By signing below, Client represents that Client has read this Agreement and agrees to its terms.*

|                ENTITY                |              INDIVIDUAL              |
|:------------------------------------:|:-----------------------------------:|
|                                      | Francis P. Maybank                  |
| Entity Name ("Client") Please Print  | Individual Name ("Client") Please Print |

By: _____        *Francis P. Maybank* (signature)

Title: _____        Signature(s)

Employer Identification No. _____   Social Security or          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
                                         Individual Taxpayer
                                         Identification No. _____

Branch Banking and Trust Company of SC accepts its designation as Wealth Manager and
Custodian in accordance with the terms and provisions of this Agreement, this 23rd day of
*August*, 2006.

                          BRANCH BANKING AND TRUST COMPANY OF SC

                          By: *Judy Schroemer* (signature)

BB&T Asset Management, Inc. accepts its designation as Investment Advisor in accordance with the
terms and provisions of this Agreement, this 23rd day of *August*, 2006.

                          BB&T ASSET MANAGEMENT, INC.

                          By: _____ (signature)

### TAX INFORMATION CERTIFICATION

Under penalties of perjury, Client certifies that:
(1) The Taxpayer Identification Number (Social Security Number, Individual Taxpayer
Identification Number or Employer Identification Number) appearing above is correct, and
(2) Client is not subject to backup withholding because Client is exempt from backup
withholding, or Client has not been notified by the Internal Revenue Service (IRS) that Client is
subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS
has notified Client that Client is no longer subject to backup withholding, and
(3) Client is a U.S. person (including a U.S. resident alien).
IF CLIENT IS SUBJECT TO BACKUP WITHHOLDING, CROSS OUT PART (2) ABOVE

Date: 8/23/06

_____           Francis P. Maybank
Entity Name (Please Print)            Individual Name (Please Print)

By: _____           *Francis P. Maybank* (signature)
                                       Signature(s)
Title: _____

8

**Exhibit A**
**Page 9 of 10**

## Appendix A

### Client Investment Objectives and Investment Guidelines

Investment Officer: Kris Kapoor

Administrative Officer: Judy Schoemer

Account Name: MA Francis P. Maybank

Account Number: 1752 003949

The following represents the long-term strategic investment objective for the above account. However, this strategic investment objective may fluctuate based on Bank's asset allocation process.

| | **Traditional** | **w/Alternative Investments** |
|---|---|---|
| Aggressive Growth | ☒ (100% Equity) | ☐ (75% Equity / 25% Alternative) |
| Growth | ☐ (75% Equity / 25% Income*) | ☐ (60% Equity / 20% Fixed / 20% Alternative) |
| Balanced | ☐ (60% Equity / 40% Income*) | ☐ (50% Equity / 35% Fixed / 15% Alternative) |
| Income & Growth | ☐ (50% Equity / 50% Income*) | ☐ (45% Equity / 45% Fixed / 10% Alternative) |
| Income Primary | ☐ (40% Equity / 60% Income*) | ☐ (40% Equity / 55% Fixed / 5% Alternative) |
| Income | ☐ (25% Equity / 75% Income*) | ☐ (25% Equity / 70% Fixed / 5% Alternative) |

☐ Income Only (100% Income*)

☐ Preservation of Principal

☐ Other: _____

*Fixed income investments:

*(Check One)*
☐ Taxable          ☐ Tax Free/State

Money Market Fund:

*(Check One)*
☐ Taxable          ☒ Tax Free/State

8/23/06
Date

Client Signature(s)

8/23/06
Date

Branch Banking and Trust Company

8/23/06
Date

BB&T Asset Management, Inc.

A-1

## Appendix B

## Nondeposit Investment Products Disclosure and Acknowledgement

Investment advisory services are available through BB&T Asset Management, Inc., a subsidiary of BB&T Corporation. BB&T Asset Management, Inc. advises customized investment portfolios, provides asset allocation analysis and offers other investment-related services to affluent individuals and businesses. Wealth Management and Custody services are available through Branch Banking and Trust Company, a subsidiary of BB&T Corporation.

Securities and other investments held in the Account (except to the limited extent that certain cash amounts are held on deposit in a bank) are not deposits or other obligations of BB&T Corporation, Branch Banking and Trust Company or any affiliate, are not guaranteed by Branch Banking and Trust Company or any other bank, are not insured by the FDIC or any other government agency, and are subject to investment risk, including possible loss of principal invested. BB&T Asset Management and Branch Banking and Trust Company do not guarantee the success of investments recommended or made for the Account.

The above disclosure has been explained to me in a manner that I understand.

8/23/06
Date

Francis P. Neyland
Client Signature(s)

B-1