**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | | |
|---|---|---|
| FRANCIS P. MAYBANK, | ) | No. 6:12-cv-00214-JMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **FIRST AMENDED** |
| | ) | **COMPLAINT** |
| | ) | **(Jury Trial Demanded)** |
| BB&T CORPORATION, | ) | |
| BRANCH BANKING AND TRUST COMPANY, | ) | |
| Successor in merger to BRANCH BANKING | ) | |
| AND TRUST COMPANY OF SC, | ) | |
| STERLING CAPITAL MANAGEMENT, LLC, | ) | |
| Successor in merger to BB&T ASSET | ) | |
| MANAGEMENT LLC, | ) | |
| ROSS WALTERS, and | ) | |
| ANTHONY MAHFOOD, | ) | |
| | ) | |
| Defendants, | ) | |

Plaintiff Francis P. Maybank complains of Defendants BB&T Corporation, Branch Banking and Trust Company, Successor in merger to Branch Banking and Trust Company of SC, Sterling Capital Management, LLC, Successor in merger to BB&T Asset Management LLC, Ross Walters, and Anthony Mahfood and respectfully alleges as follows:

**PARTIES, JURISDICTION AND VENUE**

1.     Plaintiff Francis P. Maybank is a citizen and resident of the County of Charleston in the State of South Carolina.

2.     Upon information and belief, Defendant BB&T Corporation is a financial holding corporation organized under the laws of the State of North Carolina with its principal place of business in Winston-Salem, North Carolina.  BB&T Corporation is a citizen and resident of the State of North Carolina.

1

3.      Upon information and belief, Defendant Branch Banking and Trust Company is a commercial bank subsidiary of Defendant BB&T Corporation and is organized under the laws of the State of North Carolina with its principal place of business in Winston-Salem, North Carolina.  Branch Banking and Trust Company is a citizen and resident of the State of North Carolina.

4.      Upon information and belief, Defendant Sterling Capital Management, LLC is the successor in merger of BB&T Asset Management LLC[1] and a registered investment advisor organized under the laws of the State of North Carolina with its principal place of business in Charlotte, North Carolina.  Sterling Capital Management, LLC is a citizen and resident of the State of North Carolina.

5.      The three corporate defendants, BB&T Corporation, Branch Banking and Trust Company, and Sterling Capital Management, LLC, will hereinafter collectively be referred to as "BB&T" and/or "the Bank."

6.      Upon information and belief, Branch Banking and Trust Company is registered to do business in South Carolina and is in good standing with the South Carolina Secretary of State. BB&T engages in continuous and systematic activities within the State of South Carolina, including the use of the courts of this State to enforce contractual and other rights against citizens of South Carolina.

7.      BB&T presently conducts business and, at all relevant times, conducted business and performed acts in Greenville County, South Carolina and has sufficient contacts and business within Greenville County, South Carolina so as to be subject to the *in personam* jurisdiction of this Court pursuant to the laws of South Carolina.

---

[1]  BB&T Asset Management LLC is itself a successor in merger of BB&T Asset Management, Inc.

2

8.      On information and belief, Defendant Ross Walters is a citizen and resident of the County of Pickens in the State of South Carolina.  At the times relevant to the claims herein, Walters was an agent, employee, servant and/or representative of the Wealth Management Department of Branch Banking and Trust Company assigned to its Greenville, South Carolina headquarters.  Walters was the senior executive in charge of wealth management functions and business in Greenville on behalf of customers of the Bank and also has obligations related to maximizing and increasing the profits of the Bank from its Greenville operations.

9.      On information and belief, Defendant Anthony Mahfood is a citizen and resident of the County of Greenville in the State of South Carolina.  At the times relevant to the claims herein, Mahfood was an agent, employee, servant and/or representative of the Wealth Management Department of Branch Banking and Trust Company.   In that capacity, under the supervision of Walters, Mahfood served as the wealth manager in charge of Mr. Maybank's accounts with the Bank.

10.     At all times relevant to this case, Walter and Mahfood, as set forth herein, owed independent, individual and personal duties to Mr. Maybank for their actions, inactions, omissions and wrongdoings with respect to the advice given, actions taken, omissions made and fiduciary management of Mr. Maybank's assets.  Walters and Mahfood were also agents, representatives, servants and/or employees of BB&T and Plaintiff is informed and believes that all of their actions, inactions, omissions and wrongdoing were performed for and on behalf of the Bank in the course and scope of their agency and/or employment with BB&T.  Therefore, in addition to Walters and Mahfood's personal liability for their own actions, inactions and omissions, BB&T is directly liable and also jointly, severally, fully accountable, and totally liable for the mismanagement, misconduct, wrongdoing, actions and/or omissions of Walters and

3

Mahfood under agency law, common law principles of *respondeat superior*, and state securities laws.

11.    All claims arising under this Complaint are governed by the laws of the state of South Carolina.  Venue is proper in Greenville County, South Carolina because the most substantial parts of the acts and omissions giving rise to the causes of action in this Complaint occurred in Greenville County, Defendant BB&T has locations in and holds itself out as doing business in that South Carolina county, and because Defendant Mahfood lives and Defendants Walters and Mahfood both work in Greenville County.

12.    All five named defendants, including corporate Defendants BB&T Corporation, Branch Banking and Trust Company, and Sterling Capital Management, LLC, as well as the non-corporate named Defendants Walters and Mahfood, will hereinafter collectively be referred to as "Defendants."

13.    The parties and subject matter involved in this Complaint are within the jurisdiction of this Court.

## STATEMENT OF FACTS

14.    Francis P. Maybank was born in Charleston, South Carolina, on September 30, 1932.  As of the filing of this Complaint, Mr. Maybank is seventy-nine (79) years old.

15.    After graduating from college in 1955, Mr. Maybank joined the United States Army and served on active duty as an infantryman for two years, attaining the rank of sergeant. He completed the remaining years of his military commitment in the United States Army Reserve and was honorably discharged.

4

16.     Beginning in 1958, Mr. Maybank worked in the financial services industry in New York City for over twenty years.  In or around 1980, he moved to Greenville, South Carolina and continued to work in the financial services industry in this State.

17.     In 1988, Mr. Maybank formed the Southeastern Trust Company ("Southeastern"), a trust and asset management company based in Greenville, South Carolina that provided trust services and asset management to individuals, businesses, charities and other organizations.

18.     As a result of Mr. Maybank's diligent efforts, prudent management and successful business practices, over the next twelve years his company grew to four offices (one each in Greenville, Anderson, Columbia, and Charleston) with more than $700 million in client assets under management.

19.     In 2001, BB&T contacted Mr. Maybank and expressed its interest in acquiring Southeastern.  BB&T entered into discussions with Mr. Maybank to purchase Southeastern.  As a part of the acquisition, BB&T told Mr. Maybank that Southeastern's principals, including Mr. Maybank, as well as its employees, would become part of BB&T's organization.  BB&T expressed a desire to retain Southeastern's staff to encourage Southeastern's existing clientele and $700 million in assets under Southeastern's management to stay with BB&T.

20.     As a condition of BB&T's purchase of Southeastern, the Bank required Mr. Maybank to stay on as an employee of BB&T for a term of five years, in what was then known as the BB&T Trust Department.

21.     BB&T limited Mr. Maybank's role as a BB&T employee to client relations.  Mr. Maybank's responsibilities involved issues of client development, retention, and personal relations in which he was to encourage clients of Southeastern to remain as clients of BB&T and assist with their transition into the BB&T system.

22.     In his new role, Mr. Maybank worked as a member of the BB&T team.  BB&T represented that its Wealth Management/Trust Department was highly trained, thoroughly knowledgeable, dedicated to being a champion for the interests of clients, and that it specialized in working with each client to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client.  As part of his client development responsibilities, Mr. Maybank was required to promote BB&T's corporate culture as being inherently client-centric and conservative and therefore a good fit for Southeastern's clients.

23.     BB&T's senior management held regular staff meetings during which pronouncements were made about the Bank's corporate philosophy, including the high moral obligation to which BB&T always held itself and its employees to put the interests of its clients and customers above the interests of the Bank and its employees.  While employed by the Bank, Mr. Maybank was exposed to these statements which were made both during employee educational trainings and in reports to shareholders.

24.     As a result of this avowed corporate philosophy and culture, Mr. Maybank came to view BB&T as a responsible, capable, knowledgeable and skilled wealth manager that would manage the assets under its control in the best interest of its clients.

25.     BB&T did not provide cash consideration for its acquisition of Southeastern. Instead, in exchange for Mr. Maybank's interest in Southeastern, BB&T agreed to an exchange of its shares for those of Southeastern at a share exchange ratio.  This arrangement resulted in BB&T exchanging its stock for the stock of Southeastern.  As a result of the exchange, BB&T

had no cash outlay to complete the transaction, other than costs such as legal and accounting fees.

26.     For his shares of Southeastern, Mr. Maybank received approximately 246,000 shares of common stock in BB&T.

27.     BB&T prohibited Mr. Maybank from selling his newly-acquired BB&T stock during a two-year lock-up period following the sale.

28.     Mr. Maybank maintained his role with BB&T for the five (5) years specified in his employment contract.  Throughout this period, Mr. Maybank's duties continued in a similar manner as described above.

29.     In or about the summer of 2006, as his employment contract with BB&T was drawing to a close, Mr. Maybank was contemplating total retirement to spend his remaining time with his family enjoying the fruits of his more than fifty years of work.  At the time, Francis Maybank was nearing 74 years of age.

30.     BB&T represented to the public, to its customers, and to Mr. Maybank in particular, that it was a prudent, safe, financially knowledgeable and trustworthy institution that was skilled and experienced in the management of funds, assets and wealth and would provide services and advice to its customers in accordance with each customer's particular needs and best interests.

31.     BB&T promoted its Wealth Management Department (formerly known as the Bank's Trust Department) to the general public and to Mr. Maybank claiming it would take an individualized and holistic approach to managing client assets and investments and selling itself as a one-stop shop for client needs.

32.    BB&T represented its Wealth Management Department to the general public and to Mr. Maybank as having highly trained, knowledgeable advisors, including but not limited to Mahfood and Walters, who, as dedicated fiduciaries, provided their clients with a superior level of integrated services and support.

33.    BB&T represented to the general public and to Mr. Maybank that its wealth managers, including but not limited to Mahfood and Walters, would take time to understand the issues presented by each client's own unique set of circumstances, including the need for conservative and prudent investment management for individuals like Mr. Maybank who were ready to retire and rely on the income generated by their accumulated assets.

34.    BB&T represented to the general public and to Mr. Maybank that it and its employees, including but not limited to Mahfood and Walters, would serve as partners to the client for investment services and that it and its employers would provide and utilize the best outside resources when needed, including legal counsel, tax advisors or asset managers.

35.    BB&T emphasized to the general public and to Mr. Maybank that its wealth managers, including but not limited to Walters and Mahfood, would tailor investment strategies to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client, and would coordinate and supervise all services offered by the Bank as the custodian and fiduciary of the client's investments.

36.    Based on his experience as an employee of BB&T, Mr. Maybank had come to believe in and trust the Bank's approach to wealth management and its adherence to a corporate philosophy based on high moral obligations to its customers.  Mr. Maybank further believed, based upon the assurances made to him by Defendants, that if he turned over his financial life to BB&T and its employees, including Walters and Mahfood, then the Bank would craft

8

comprehensive solutions tailored to his individual needs and provide prudent, holistic management of his assets and insurance needs. He could then retire with peace of mind, secure in the knowledge that his fiduciary wealth managers would be acting in his best interests.

37. As he moved into retirement, Mr. Maybank needed and expressly sought the safety and security of fiduciary management of his irreplaceable assets, because in his retirement he intended to delegate investment responsibilities and the management of his assets to professional fiduciaries. Mr. Maybank sought the advice and protection offered by the BB&T Wealth Management/Trust Department, with whom Mr. Maybank had an existing relationship of trust and confidence, and whom he understood owed special duties of care as fiduciaries. Mr. Maybank was assured that the BB&T Wealth Management/Trust Department and its employees, including Mahfood and Walters, provided the added protection and oversight that he sought in retirement and expected from knowledgeable fiduciaries. Because of the fiduciary duties expressly undertaken by the BB&T Wealth Management/Trust Department, Mahfood and Walters, Mr. Maybank understood that Defendants would be obligated to advise him with undivided loyalty, with his best interests in mind, and with competent, non-conflicted advice.

38. As a result of the representations made by BB&T, Walters, Mahfood and other Bank representatives, Mr. Maybank placed the utmost faith, trust, and confidence in Defendants to look after his financial interests.

39. Based on this relationship, in or about the summer of 2006, Mr. Maybank met with representatives of the BB&T Wealth Management/Trust Department, including Mahfood and Walters, to engage Defendants as his fiduciaries and entrust them with his assets, so that he could benefit from the Wealth Management/Trust Department's prudent and conservative

9

management of those assets under the plans Defendants would develop for his impending retirement.

40.    In 2006, the Defendants were already serving as fiduciaries for Mr. Maybank, as the Bank had already sought and accepted the role of trustee under the Irrevocable Trust Agreement created by Mr. Maybank as Grantor ("Insurance Trust").   Mahfood was Mr. Maybank's point of contact at BB&T for advice and service on all matters relating to the Insurance Trust, and on information and belief Walters supervised Mahfood's activities relating to the Insurance Trust.

41.    As Mr. Maybank transitioned into full retirement, the Defendants' fiduciary role expanded as Mr. Maybank entrusted the vast majority of his financial life to Defendants for management.  The assets and issues to be managed included Mr. Maybank's securities holdings, including his BB&T stock, as well as the policies within the Insurance Trust.  Walters and Mahfood also offered the Bank's services and agreed to act as the personal representative of Mr. Maybank's estate upon his death.  The decision to entrust his financial life to BB&T, Walters and Mahfood was made in reliance on the many representations made by the Bank that the professional fiduciaries in its Wealth Management/Trust Department, including Mahfood and Walters, could and would manage all assets entrusted to them, and could and would develop an investment plan designed to safely and prudently meet Mr. Maybank's needs, thus allowing him to enjoy his retirement and the rewards of his many years of work without worry or concern.  Mr. Maybank told Defendants, including but not limited to Mahfood and Walters, that he was relying upon them exclusively for retirement planning and wealth management and, in seeking to become and becoming Mr. Maybank's Wealth Managers, they willingly agreed to accept that responsibility.

42.     BB&T and Mr. Maybank entered into a contractual relationship, ultimately signing a contract prepared by BB&T and entitled the BB&T Wealth Management Agreement, a copy of which is attached as Exhibit 1 to this Complaint.  Under the Wealth Management Agreement, the Bank promised to serve as Mr. Maybank's Wealth Manager as to all assets entrusted to it and to make suitable and appropriate recommendations to Mr. Maybank regarding an investment program and investment guidelines for his assets under management. Furthermore, Mahfood and Walters either orally or impliedly agreed to advise Mr. Maybank honestly, fairly, competently and prudently, in accordance with his best interests, and with undivided loyalties, always putting Mr. Maybank's interests ahead of their own and the Bank's. Mahfood and Walters further either orally or impliedly agreed to comply with all industry standards and contractual obligations undertaken by the Bank, as well as any applicable state laws in the management of Mr. Maybank's assets.

43.     Pursuant to their agreements with Mr. Maybank, Defendants agreed to "gather information from [Mr. Maybank] regarding [his] investment objectives, risk tolerance and investment horizon, tax status, financial situation and needs."  Using that information, they further agreed to "make recommendations to [Mr. Maybank] regarding an investment program and investment guidelines for [his assets]" and to "coordinate and supervise the services of the Investment Advisor and Custodian for the Account."  *See* BB&T Wealth Management Agreement at I.  Consistent with the Bank's representations of its corporate philosophy, BB&T, Walters and Mahfood assumed the duty to act in a client-centered fashion and in Mr. Maybank's best interest.  As Mr. Maybank's fiduciaries and pursuant to the Agreements, Defendants were obligated to act in good faith, placing Mr. Maybank's interests before their own and to make

11

only recommendations which would be suitable for Mr. Maybank in light of his investment objectives, risk tolerance and investment horizon, tax status, financial situation and needs.

44.     During his meetings with BB&T, Mahfood and Walters, Mr. Maybank explained his investment goals for retirement:  paying off debt, ensuring stable and secure income during his lifetime, and protecting his ability to provide for his heirs.  Mr. Maybank explained to Defendants that he would be relying upon investment income to fund his retirement, including his on-going family commitments and those involved in the Insurance Trust.

45.     Because Mr. Maybank would be losing his source of earned income, he also needed to eliminate debt as he moved into retirement.  His principal debt obligation was in a margin account with Scott & Stringfellow, a BB&T affiliated brokerage firm.  This debt of approximately $2.3 million resulted from obligations largely incurred while Mr. Maybank had owned and operated Southeastern.

46.     While acting as Mr. Maybank's wealth managers, Defendants counseled, advised, and recommended to Mr. Maybank a strategy that unbeknownst to Mr. Maybank was aggressive, excessively risky and completely inappropriate and unsuitable for a retired person like Mr. Maybank.

47.     Defendants faced a serious and irreconcilable conflict of interest between their obligations to advance the company interests of BB&T by promoting its own stock and their fiduciary obligations to advise Mr. Maybank with undivided loyalty and with only his best interests in mind.  On information and belief, in 2006 Defendants considered Mr. Maybank to be a BB&T employee.  Consistent with BB&T's Code of Ethics, Defendants encouraged and recommended Mr. Maybank to continue to hold as a long-term investment his concentrated position in BB&T stock which represented the bulk of his liquid investment assets. Defendants

recognized that it is considered imprudent to have a concentrated position in a single holding, yet that was the advice mandated by their internal policies for Mr. Maybank.  In so advising Mr. Maybank, they placed their corporate responsibilities to generate profits for themselves and the Bank above Mr. Maybank's needs for a suitable diversified portfolio.

48.     Rather than recommending that Mr. Maybank reduce his BB&T stock holdings and develop a diversified and prudent portfolio to generate income during his retirement, Defendants instead advised Mr. Maybank to follow an investment strategy based upon derivatives trading with the BB&T stock.  This strategy required the execution of a highly complex derivative product known as a Variable Prepaid Forward Contract ("VPFC"). Defendants' stated purpose for the derivative transaction was to raise cash to create a diversified portfolio, which would be placed with Defendants for management.  Defendants' scheme maximized the placement of Mr. Maybank's assets in fee-generating accounts at BB&T and was designed to benefit Defendants at Mr. Maybank's expense.

49.     While Defendants recognized the speculative nature of this scheme, they nonetheless advised Mr. Maybank that the long-term retention of his concentrated holding of BB&T stock and the use of the VPFC derivative product was not speculative but was instead an appropriate defensive strategy suitable for a retired person.  Defendants further advised Mr. Maybank that this strategy would allow him to reduce the risk of his concentrated position, protect him from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth, maintain long-term share ownership of the BB&T stock, and help him achieve important diversification goals.

50.     Defendants failed to advise Mr. Maybank of the gross conflict of interest existing when they advised him about the management and/or retention of their own company's stock.

51.     Since 1903, BB&T had never failed to pay its shareholders a dividend, a fact BB&T advertised extensively to its employees and shareholders, including Mr. Maybank, taking great pride in its corporate record for paying dividends.

52.     BB&T advertised and regularly touted itself, both to its employees and shareholders, as a "Dividend Aristocrat."  This prestigious designation was conferred by Standard & Poors on S&P 500 companies that had increased its dividend payments to shareholders every year for at least the last twenty-five (25) consecutive years.  The representation was clear:  BB&T will pay ever increasing dividends into the future without fail.

53.     The strategy devised by Defendants to accomplish Mr. Maybank's investment objective of an on-going source of retirement income relied mainly upon their ill-advised, conflicted and unsustainable representation that the BB&T dividend was assured to increase.

54.     The strategy devised by Defendants was intended to induce Mr. Maybank to most of his liquid investments, holdings and assets to BB&T's Wealth Management division over which Walters, Mahfood and other employees of the Bank would exercise investment control and management responsibilities and from which Mahfood and Walters would generate substantial fees for the Bank and income for themselves.

55.     The holistic wealth management plan advocated by Defendants, including Walters and Mahfood, was attractive and persuasive to Mr. Maybank due to his stated desire to delegate to professionals the management of his investments as he transitioned into retirement.

56.     The recommendations of Defendants, including but not limited to Mahfood and Walters, that Mr. Maybank continue to hold his concentrated position in the BB&T stock and rely upon it as his primary source of income were based upon express and implied representations that BB&T would continue without interruption to pay dividends at or above

14

historic levels. Without the continued payment of this substantial dividend, Defendants knew, or should have known, that their flawed strategy was doomed to failure, all to Mr. Maybank's great expense and damages. Unbeknownst to Mr. Maybank, the strategy was a ticking time bomb that would destroy his financial well being if BB&T decreased its dividend and/or if the share price of BB&T stock was substantially reduced. These risks and others were not explained to Mr. Maybank and he had no knowledge of any potential problem until the first quarter of 2009. Even then he was not aware of the full scope of the problem until much later as the recklessness and imprudence of the strategy continued to emerge to reveal the unvarnished truth that Defendants had destroyed his life's work and life's savings through an ill-conceived, incompetently devised, recklessly risky, and inherently conflicted strategy that paid them handsome fees while destroying his financial well-being. In the preceding and following paragraphs some of the key facts of this doomed strategy are set forth. Others no doubt will be brought to light during the conduct of discovery in this sad, but entirely avoidable case of corporate greed, exploited trust, failed due diligence, incompetence, and gross mismanagement of Mr. Maybank's irreplaceable assets.

57.    The VPFC recommended and purchased by Defendants paid a "contractual dividend" based upon BB&T's dividend, and the up-front cost of the VPFC was calculated based upon BB&T's continuing payment of dividends at or above historic levels.

58.    BB&T and its employees, including Mahfood and Walters, represented to Mr. Maybank that they had special expertise in VPFCs, including the experience of conducting an exhaustive search of the marketplace for VPFCs to find the best available VPFC to advance the comprehensive investment goals and strategy established by BB&T.

59.      BB&T represented and recommended an exotic, complicated VPFC to Mr. Maybank as being suitable, appropriate, and prudent, as well as the best method to accomplish the following goals:

A.      Immediately generate funds to pay off outstanding debt;

B.      Significantly reduce the risk of a concentrated position and create a diversified portfolio;

C.      Avoid creating any taxable events during the life of the VPFC and any rollovers.

D.      Retain the benefit of gains made by the BB&T stock during the life of the VPFC and any rollovers;

E.      Protect against losses in the BB&T stock during the life of the VPFC and any rollovers;

F.      Protect and ensure the continued receipt of sure-fire, ever increasing dividends from the BB&T stock and any rollovers; and

G.      Continue all of the above-listed benefits into the future by rolling over the VPFC as required or desired.

60.      Defendants, including but not limited to Mahfood and Walters, did not explain to Mr. Maybank the speculative and risky nature of the VPFC nor its associated fees and costs. Specifically, when this transaction was proposed, Defendants, including but not limited to Mahfood and Walters, in violation of their fiduciary, common law, statutory and contractual obligations, failed to provide Mr. Maybank with a complete description of the imbedded and upfront costs and fees associated with VPFCs, nor with a complete description of the investment

risks involved in the transaction and proposed strategy, nor and most importantly with any viable, well researched, tried and true, and historically proven options or alternatives.

61.     Defendants, including but not limited to Mahfood and Walters, did not disclose, explain, or otherwise provide Mr. Maybank with complete and accurate explanations of the negative implications of participating in a VPFC, including, but not limited to:

A.     The riskiness of the VPFCs;

B.     The unsuitability of VPFCs for a person in Mr. Maybank's position and station in life;

C.     The tax implications of the VPFCs;

D.     The full costs and fees associated with the VPFC, embedded or otherwise; and

E.     Mr. Maybank's options at the end of the VPFC and implications of those options on Mr. Maybank's BB&T stock position and dividend income, including early termination/roll-over costs.

62.     In reliance upon the advice provided by Defendants, including but not limited to Mahfood and Walters, and at their direction, on or about August 11, 2006, Mr. Maybank executed a three year VPFC ("VPFC No.1") which by its terms would expire on August 11, 2009.

63.     In furtherance of the wealth management scheme designed by Walters and Mahfood, Defendants first applied the proceeds of VPFC No.1 to satisfy Mr. Maybank's outstanding obligations, paying off the margin debt owed to BB&T subsidiary Scott & Stringfellow.   The remaining proceeds were entrusted to Defendants for management ("Investment Account").

64.    Under the wealth management plan designed by Walters and Mahfood, the stated reason for the purchase of the VPFC was to raise cash from which to create a diversified portfolio for Mr. Maybank.  The BB&T stock associated with the VPFC already over-exposed Mr. Maybank to the risks inherent in traditional investments in marketable equity securities. Despite this overexposure, Defendants nonetheless approved and implemented a strategy in the Investment Account involving a one hundred percent (100%) equity concentration in aggressive growth stocks.  At no time did Defendants, including but not limited to Mahfood and Walters, advise Mr. Maybank that the strategy implemented for him was unsuitable and risky and placed his life's savings in serious jeopardy of destruction.  On the contrary, Defendants, including but not limited to Mahfood and Walters, provided soothing assurance that the strategy was fully researched and designed to be prudent and suitable for his unique needs.

65.    Pursuant to the written agreement prepared by BB&T, the Bank and its Asset Management subsidiaries along with Mahfood and Walters had complete discretion in and totally controlled the Investment Account, the trading activity in the Account, and any purported investment strategy.   Believing that Defendants, including but not limited to Mahfood and Walters, were acting as his fiduciaries and protecting his interests, Mr. Maybank followed their advice and did not question nor have reason to question that advice, which unbeknownst to him was imprudent, aggressive, uninformed, conflicted, negligent, reckless, and in breach of the contractual, fiduciary common law and statutory obligations Walters, Mahfood and the Bank owed to Mr. Maybank.

66.    The Bank's Code of Ethics makes clear that Bank employees like Walters and Mahfood, who served as wealth management and investment advisors to customers, have independent fiduciary duties to those customers and are required to put the interests of the

18

customers before their own interests or the interests of the Bank.  See Exhibit 2, BB&T Code of Ethics.  Specifically, the Code of Ethics provides:

> BB&T acts as a fiduciary in certain financial related transactions with its clients, including serving as trustee and investment advisor. If you are responsible for performing fiduciary services on behalf of BB&T, you have a legal duty to act in the best interests of BB&T's client. This means that you, as BB&T's representative, must always put the client's interests ahead of your own interest and that of BB&T.  As a fiduciary representative, you are further obligated to promptly disclose to the client any actual or potential conflict of interest.

67.     Mr. Maybank did not receive the diversified portfolio promised by Defendants, including but not limited to Mahfood and Walters, when they sold him the VPFC, but was instead doubly exposed to market risk, which was unsuitable and inappropriate for an investor of his age and with his need for a reliable source of income, both for his living expenses and to cover premium payments for policies held in the insurance trusts for which BB&T acted as trustee.

68.     Although Defendants recommended the VPFC purportedly as part of a comprehensive and holistic wealth management plan, they did not explain and Mr. Maybank did not understand the operation and/or limitations of the VPFC.  Specifically, Defendants, including but not limited to Mahfood and Walters, did not explain and Mr. Maybank did not understand that this highly complex derivative product would eventually force the investor to choose amongst several unattractive and very expensive options:

(1)     Tender a cash re-payment to the lender equal to the original value of the entire stock position, i.e., the amount of the forward cash loan disbursement, plus the large advance fee (or 100% of the stockholder's original stock position), in order to reclaim the pledged stock;

(2)    Relinquish ALL pledged stock to the lender, less the equivalent of any gains made by the stock during the life of the VPFC, thus permanently forfeiting both the stock and any future dividend income and triggering a tax liability ; or

(3)    Pay an additional advance fee and also face tax consequences due to the now realized stock sale to roll the original VPFC into a second VPFC, thus at least maintaining the right to receive dividends from the pledged stock.

69.    Defendants, including but not limited to Mahfood and Walters, knew or should have known that the investment strategy they devised and implemented effectively eliminated both of the first two options.  As a retired person, Mr. Maybank had no source of outside funds from which to repay over $9.3 million in original VPFC proceeds and fees, thus placing the first option beyond his reach.  Nor could Mr. Maybank relinquish the pledged stock – since Defendants failed to create the promised diversified portfolio upon which their original recommendation was premised leaving Mr. Maybank with only one remaining financial asset, i.e., the still concentrated position in now reduced value BB&T stock and its substantially reduced dividend payment for his primary source of retirement income.  Thus, Defendants knew, although Mr. Maybank did not, that their investment strategy locked him into an endless, expensive, damaging cycle from which there was no escape.

70.    Defendants, including but not limited to Mahfood and Walters, knew or should have known, but did not advise Mr. Maybank, that his only option would be to continue to roll over the VPFC.  This remaining "option" had the potential to lock Mr. Maybank into paying more and more fees, but the substantial fees and tax liabilities triggered by the subsequent roll-overs would further deplete the amount available for investment.  Repetition of this cycle would

20

eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing. In short, he was placed into a financial death spiral by Defendants' negligent, reckless, grossly negligent, imprudent and incompetent advice and actions. Further, as a result of Defendants' failure to explain the operation of the VPFC and its inherent risk and enormous cost, Mr. Maybank was completely unaware that his meaningful options as well as his financial well-being had been sabotaged, destroyed and hugely damaged.

71.     With financial markets in turmoil, in or about January 2009, in anticipation of VPFC No. 1 terminating in August 2009, Mr. Maybank reiterated to Defendants his need to meet his investment objective of on-going retirement income for the remainder of his life.

72.     Defendants, including but not limited to Mahfood and Walters, knew (but did not explain to Mr. Maybank) that Mr. Maybank could not afford to retain the BB&T stock as an income source by buying out VPFC No. 1, as such a cash settlement would have required repayment of over $9.3 million. This amount was well beyond the means of a retired person like Mr. Maybank, particularly since a substantial portion of the original proceeds of VPFC No. 1 was no longer available because it had been used to retire debt owed to a BB&T subsidiary.

73.     Defendants also knew (but did not explain to Mr. Maybank) that their failure to create from the proceeds of VPFC No. 1 the promised diversified portfolio capable of generating retirement income also prevented Mr. Maybank from simply relinquishing his BB&T stock, as the BB&T stock was then essentially his only source of income.

74.     Defendants knew (but did not explain to Mr. Maybank) that as a result of their own negligent, grossly negligent, reckless and incompetent advice and misconduct relating to VPFC No. 1, the nature and extent of which was unknown to Mr. Maybank, combined with the mismanagement of the Investment Account, that Mr. Maybank's only option was a rollover of

VPFC No. 1.  Defendants, including but not limited to Mahfood and Walters, therefore recommended, approved and implemented the rollover of VPFC No. 1 into another complex derivative ("VPFC No. 2"), as the best way to accomplish Mr. Maybank's continuing investment objective of generating retirement income.  Defendants knew, however, or should have known, that their conflicted, reckless, grossly negligent advice, misconduct and mismanagement had trapped Mr. Maybank into an endless cycle of rollovers until he was financially ruined and unable to pay the cost of another rollover (the death spiral), knowledge that they deliberately withheld from Mr. Maybank.

75.     In recommending and preparing the roll-over transaction, Defendants, including but not limited to Mahfood and Walters, failed to advise or in any way inform Mr. Maybank of the magnitude of the fees and costs involved in the premature termination/early roll-over of VPFC No.1 prior to its scheduled termination date or of the tax consequences of doing so.

76.     Not until **after** the VPFC No.1 - VPFC No.2 rollover transaction was executed, did Mahfood disclose to Mr. Maybank that he would incur the outrageous sum of almost $1.3 million in costs and fees for the rollover into VPFC No.2.

77.     The reason for the rollover of VPFC No.1 into VPFC No.2 was to protect Mr. Maybank's on-going ability to receive dividend income, which continued to be projected as ever increasing.  During the two year life of VPFC No.2, Mr. Maybank would have received dividends of approximately $800,000, had BB&T continued to pay dividends at the then historic rate of 47¢/share/quarter.  Therefore, Mr. Maybank's fiduciaries advised and sold a product for which Mr. Maybank subsequently paid an upfront fee of nearly $1.3 million to receive approximately $800,000 in dividend income spread over two years.  This advice was inexplicably incompetent.  From the outset, the foundation of Defendants' ill conceived strategy

was an ever increasing dividend payment from BB&T stock. That foundation abruptly changed in mid-2009 when BB&T drastically cut its dividend. Mr. Maybank only received dividend income of approximately $230,000 (about 70% less than projected) during the life of VPFC No. 2, so that the rollover of the VPFC did not even accomplish the limited goal of protecting Mr. Maybank's receipt of dividend income.

78.     In or about late February or early March of 2009, Defendants informed Mr. Maybank that, the VPFC roll-over may have triggered an ordinary income tax liability of up to $1 million.

79.     As a result of the incompetent, negligent, grossly negligent, reckless and imprudent "wealth management" provided by the Defendants, Mr. Maybank suffered losses in the unsuitably managed Investment Account, paid cash calls of approximately $1,700,000, incurred substantial tax liabilities, forfeited valuable insurance policies, and incurred fees and costs associated with subsequent VPFC roll-overs incurred in the financial death spiral into which he was placed by Defendants.

### FOR A FIRST CAUSE OF ACTION
#### Breach of Contract

80.     The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this First Cause of Action.

81.     Upon the opening of the Mr. Maybank's account with the BB&T Trust Department, and then as the account began to be managed by Defendants, BB&T entered into both express agreements and implied agreements with the Mr. Maybank, including the BB&T Wealth Management Agreement. These agreements constituted contracts between the Mr. Maybank and BB&T (hereinafter "the Agreements").

82.     As a customer of BB&T and also pursuant to the Wealth Management Agreement between the parties, Mr. Maybank had contracts with BB&T, pursuant to which BB&T owed Mr. Maybank a duty to advise him honestly, fairly, competently, and prudently, and in accordance with his needs, goals and best interests.

83.     In addition, South Carolina law further implies a duty of good faith and fair dealing into every contract, including the Wealth Management Agreement and the VPFCs arranged and recommended by BB&T.

84.     Defendants breached their Agreements with Mr. Maybank in one or more of the following particulars:

        A.     Defendants placed their own interests ahead of Mr. Maybank's by creating, recommending, and implementing a risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, negligent, and reckless for Mr. Maybank;

        B.     Defendants placed their own interests ahead of Mr. Maybank's thus treating him as a profit center and cross-selling opportunity, instead of as their fiduciary principal;

        C.     Defendants repeatedly advocated and recommended risky derivative products that failed to meet Mr. Maybank's investment objectives and needs while guaranteeing substantial profits for Defendants;

        D.     Defendants failed to advise Mr. Maybank of the patent conflicts of interest inherent in their promotion of a wealth management and investment strategy premised upon his holding an over-concentrated position of BB&T stock;

24

E.     Despite knowing that their plan was speculative, risky and unsuitable, Defendants nonetheless created and recommended to Mr. Maybank a wealth management and investment plan based on a speculative and costly VPFC without advising him of its known speculative nature, nor of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.     Defendants created a multi-level fee structure when they advised Mr. Maybank to purchase a risky derivative product (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mr. Maybank's;

G.     Defendants knew, but failed to disclose to Mr. Maybank, that their "wealth management" strategy would trap him into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing;

H.     Defendants knew of, but failed to disclose to Mr. Maybank their own financial interests in recommending speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

I.     Defendants failed to ascertain or understand the nature and type of securities promoted to and purchased for Mr. Maybank    and/or

misrepresented those securities to him, resulting in substantial losses due to unsuitable and imprudent investments being placed in his account;

J.   Defendants twice advised Mr. Maybank to invest his funds in VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mr. Maybank; and/or

K.   Defendants failed to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction.

85.   Defendants' acts and omissions constitute failures to abide by the terms of the Agreements, and constitute breaches of the Agreements entered into with Mr. Maybank.  Mr. Maybank has been directly and proximately damaged as a result of Defendants' breaches.

86.   Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) attorneys' fees, (4) costs, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

## FOR A SECOND CAUSE OF ACTION
### Breach of Oral and/or Implied Contract (Against Walters and Mahfood)

87.   The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Second Cause of Action.

88.   As Mr. Maybank began making plans for his pending retirement, Walters and Mahfood solicited and induced Mr. Maybank to entrust them and the Bank with the management of his assets.

89.   Walters and Mahfood represented to Mr. Maybank that they would tailor investment strategies to Mr. Maybank's investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs, and would coordinate and supervise

26

all services offered by the Bank as the custodian of his investments and fiduciary for Mr. Maybank.

90.    Mr. Maybank expressly sought the safety and security of fiduciary management for his irreplaceable assets, because in his retirement he intended to delegate investment responsibilities and the management of his assets to professional fiduciaries like Walters and Mahfood, who in offering their professional services to Mr. Maybank, agreed to act as his fiduciaries.

91.    In consideration of the investment advice Walters and Mahfood promised to provide Mr. Maybank, including, but not limited to, a comprehensive solution tailored to his individual needs and to provide prudent, suitable and holistic on-going management of his investment assets, Mr. Maybank entrusted for management by Walters, Mahfood and the Bank assets earned over fifty years of work.  By seeking the opportunity to manage Mr. Maybank's investment assets, Walters and Mahfood manifested their intent, assent, and oral or implied agreement to manage Mr. Maybank's investment assets as stated herein and as his professional fiduciaries.

92.    In entrusting his investment assets to Walters and Mahfood, Mr. Maybank agreed to the fiduciary management of his assets by Walters, Mahfood, and the Bank.

93.    In agreeing to manage Mr. Maybank's assets as his fiduciaries, Walters and Mahfood agreed to advise him honestly, fairly, competently, and prudently, and in accordance with his needs, goals and best interests, as stated above.

94.    In addition, South Carolina law further implies a duty of good faith and fair dealing into every contract, including the oral or implied contract entered into by Walters and Mahfood with Mr. Maybank.

95.     Walters and Mahfood breached their contract with Mr. Maybank in one or more of the following particulars:

A.     They placed their own interests ahead of Mr. Maybank's by creating, recommending, and implementing a risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, negligent, and reckless for Mr. Maybank;

B.     They placed their own interests ahead of Mr. Maybank's thus treating him as a profit center and cross-selling opportunity, instead of as their fiduciary principal;

C.     They repeatedly advocated and recommended risky derivative products that failed to meet Mr. Maybank's investment objectives and needs while guaranteeing substantial profits for Defendants;

D.     They failed to advise Mr. Maybank of the patent conflicts of interest inherent in their promotion of a wealth management and investment strategy premised upon his holding an over-concentrated position of BB&T stock;

E.     Despite knowing that their plan was speculative, risky and unsuitable, Walters and Mahfood nonetheless created and recommended to Mr. Maybank a wealth management and investment plan based on a speculative and costly VPFC without advising him of its known speculative nature, nor of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.    They created a multi-level fee structure when they advised Mr. Maybank to purchase a risky derivative product (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Walters and Mahfood's self-interests at the expense of Mr. Maybank's;

G.    They knew, but failed to disclose to Mr. Maybank, that their "wealth management" strategy would trap him into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing;

H.    They knew of, but failed to disclose to Mr. Maybank their own financial interests in recommending speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

I.    They failed to ascertain or understand the nature and type of securities purchased for Mr. Maybank and/or misrepresented those securities to him, resulting in substantial losses due to unsuitable and imprudent investments being placed in his account;

J.    Walters and Mahfood twice advised Mr. Maybank to invest his funds in VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mr. Maybank; and/or

29

K.    They failed to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction.

96.    The acts and omissions of Walters and Mahfood constitute failures to abide by the terms of their oral implied contract with Mr. Maybank, and constitute breaches thereof.  Mr. Maybank has been directly and proximately damaged as a result of the breaches.

97.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) attorneys' fees, (4) costs, (5) prejudgment interest at the highest legal rate, and (6) such other relief as is just, equitable, and proper.

## FOR A THIRD CAUSE OF ACTION
### Breach of Fiduciary Duty

98.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Third Cause of Action.

99.    Mr. Maybank expressly sought the safety and security of fiduciary management for his irreplaceable assets, because in his retirement he intended to delegate investment responsibilities and the management of his assets to professional fiduciaries.  Defendants, both individually and collectively, agreed to act as his fiduciaries. Defendants, who were already serving as trustees over his insurance trusts, undertook to provide fiduciary wealth management and investment advisory services to Mr. Maybank and also agreed to serve as the personal representative of his estate after his death.  Such relationships are fiduciary under South Carolina law and were recognized as such by Defendants in the BB&T Code of Ethics.

100.    Mr. Maybank's relationship with Defendants, including Walters and Mahfood, involved a relationship of the utmost trust and confidence because of the parties' preexisting relationships, the nature of the transactions in question, and the parties' Agreements, both

express and implied.  This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants, both individually and collectively, to act with perfect good faith and undivided loyalty in the interests of Mr. Maybank.

101.    As the fiduciaries of Mr. Maybank, Defendants owned a clear duty to Mr. Maybank of undivided loyalty, absolute faithfulness, and a duty to exercise due care and diligence with respect to the wealth management and control of Mr. Maybank's investments, assets and accounts.

102.    With the fiduciary relationship assumed and agreed to by Walters and Mahfood, individually, as well as by the Bank, also came the duties and obligations to keep Mr. Maybank fully informed of all facts pertinent to any recommended investments (including but not limited to the VPFCs) which BB&T arranged for Mr. Maybank, to make full disclosure of all facts that could materially affect his financial well-being, to avoid conflicts of interests where the Bank could or did place its interests and its affiliates' interests above Mr. Maybank's interests, to promptly disclose to Mr. Maybank any actual or potential conflict of interest, and to exercise reasonable care, diligence, and prudence in the performance of its duties.

103.    At Walters and Mahfood's urging, Mr. Maybank reposed a special confidence in them and the Bank by entrusting his assets to Defendants, who agreed to accept them and to act as his fiduciaries in providing wealth management and investment advice.  Defendants breached their fiduciary duties in one or more of the following particulars:

> A.    Defendants, including Walters and Mahfood, placed their own interests ahead of Mr. Maybank's by creating, recommending, and implementing a risky and flawed wealth management and investment strategy that was

imprudent, aggressive, uninformed, conflicted, negligent, and reckless for Mr. Maybank;

B.    Defendants, including Walters and Mahfood, placed their own interests ahead of Mr. Maybank's thus treating him as a profit center and cross-selling opportunity, instead of as their fiduciary principal;

C.    Defendants, including Walters and Mahfood, repeatedly advocated and recommended risky derivative products that failed to meet Mr. Maybank's investment objectives and needs while guaranteeing substantial profits for Defendants;

D.    Defendants, and specifically Walters and Mahfood, failed to advise Mr. Maybank of the patent conflicts of interest inherent in their promotion of a wealth management and investment strategy premised upon his holding an over-concentrated position of BB&T stock;

E.    Despite knowing that their plan was speculative, risky and unsuitable, Defendants, including Walters and Mahfood, nonetheless created and recommended to Mr. Maybank a wealth management and investment plan based on a speculative and costly VPFC without advising him of its known speculative nature, nor of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.    Defendants created a multi-level fee structure when they advised Mr. Maybank to purchase a risky derivative product (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for

which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mr. Maybank's;

G.     Defendants knew, but failed to disclose to Mr. Maybank, that their "wealth management" strategy would trap him into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing;

H.     Defendants, including Walters and Mahfood, knew of, but failed to disclose to Mr. Maybank their own financial interests in recommending speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

I.     Defendants, including Walters and Mahfood, failed to ascertain or understand the nature and type of securities purchased for Mr. Maybank and/or misrepresented those securities to him, resulting in substantial losses due to unsuitable and imprudent investments being placed in his account;

J.     Defendants, including Walters and Mahfood, twice advised Mr. Maybank to invest his funds in VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mr. Maybank; and/or

K.     Defendants, including Walters and Mahfood, failed to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction.

104.    In one or more of the preceding particulars, Defendants acted with imprudence, negligence, gross negligence, recklessness, willful misconduct, fraudulent intent, and bad faith and thereby breached the fiduciary duties owed to Mr. Maybank, proximately causing him to suffer damages.

105.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A FOURTH CAUSE OF ACTION
### Negligence, Gross Negligence, Recklessness and/or Willful and Wanton Misconduct

106.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fourth Cause of Action.

107.    Defendants, including Walters and Mahfood, each had and owed a clear duty to Mr. Maybank to exercise reasonable care, skill, diligence and prudence under the circumstances presented by Mr. Maybank's unique situation and investment objectives.

108.    Defendants, including Walters and Mahfood, each breached their respective duty to Mr. Maybank to exercise reasonable care, skill, diligence and prudence under the circumstances and such breaches caused Mr. Maybank to suffer damages.

109.    Defendants' actions and inaction as set forth herein were negligent, grossly negligent, reckless, willful and wanton, knowing and/or intentional.

110.    Defendants' conduct in the recommendation and execution of their wealth management strategy constituted imprudence, negligence, gross negligence, recklessness, bad faith and/or willful misconduct in one or more of the following particulars:

A.    Defendants, including Walters and Mahfood, placed their own interests ahead of Mr. Maybank's by creating, recommending, and implementing a risky and flawed wealth management and investment strategy that was imprudent, aggressive, uninformed, conflicted, negligent, and reckless for Mr. Maybank;

B.    Defendants, including Walters and Mahfood, placed their own interests ahead of Mr. Maybank's thus treating him as a profit center and cross-selling opportunity, instead of as their fiduciary principal;

C.    Defendants, including Walters and Mahfood, repeatedly advocated and recommended risky derivative products that failed to meet Mr. Maybank's investment objectives and needs while guaranteeing substantial profits for Defendants;

D.    Defendants, including Walters and Mahfood, failed to advise Mr. Maybank of the patent conflicts of interest inherent in their promotion of a wealth management and investment strategy premised upon his holding an over-concentrated position of BB&T stock;

E.    Despite knowing that their plan was speculative, risky and unsuitable, Defendants, including Walters and Mahfood, nonetheless created and recommended to Mr. Maybank a wealth management and investment plan based on a speculative and costly VPFC without advising him of its

known speculative nature, nor of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.     Defendants, including Walters and Mahfood, created a multi-level fee structure when they advised Mr. Maybank to purchase a risky derivative product (for which they charged substantial fees) and then to re-invest the proceeds in a BB&T account (for which BB&T charged additional management fees), which promoted Defendants' self-interests at the expense of Mr. Maybank's;

G.     Defendants, including Walters and Mahfood, knew, but failed to disclose to Mr. Maybank, that their "wealth management" strategy would trap him into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving Mr. Maybank with nothing;

H.     Defendants, including Walters and Mahfood, knew of, but failed to disclose to Mr. Maybank their own financial interests in recommending speculative VPFC products, including a complete advance disclosure of all fees and costs associated with the VPFCs;

I.     Defendants, including Walters and Mahfood, failed to ascertain or understand the nature and type of securities it purchased for to Mr. Maybank and/or misrepresented those securities to him, resulting in substantial losses due to unsuitable and imprudent investments being placed in his account

J.    Defendants, including Walters and Mahfood, twice advised Mr. Maybank to invest his funds in VPFCs although they knew or should have known that these instruments were risky and reckless and not reasonable or prudent for Mr. Maybank; and/or

K.    Defendants, including Walters and Mahfood, failed to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction.

111.    In one or more of the preceding particulars, Defendants each acted with imprudence, negligence, gross negligence, recklessness, willful misconduct, fraudulent intent, and/or bad faith and thereby breached the common law duties of care owed to Mr. Maybank, proximately causing him to suffer damages.

112.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the bad faith, gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A FIFTH CAUSE OF ACTION
### Breach of Contract, Accompanied By Fraudulent Act

113.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Fifth Cause of Action.

114.    As a customer of BB&T and pursuant to the Wealth Management Agreement with the Bank and the oral or implied agreements with Mahfood and Walters, Mr. Maybank had Agreements with each Defendant, pursuant to which Defendants owed him a duty of good faith

and fair dealing and a duty to advise him honestly, fairly and in accordance with her needs, goals and best interests.

115.     Defendants' fraudulent misconduct, actions and inactions, as alleged in this Complaint, constitute a failure to abide by the terms of defendants' contracts with Mr. Maybank, including the Wealth Management Agreement, and constitute a breach of these agreements entered into with Mr. Maybank.  Mr. Maybank has been directly and proximately damaged as a result of Defendants' breaches.

116.     Moreover, in breaching the Agreements with Mr. Maybank, Defendants exhibited a fraudulent intent relating to those breaches.

117.     Defendant's breaches of the Agreements were accompanied by fraudulent acts and/or omissions on the part of Defendants in one or more of the following particulars:

> A.     Defendants breached the Agreements when their strategy based upon the retention of the concentrated position in BB&T stock and execution of VPFCs failed to protect Mr. Maybank's investment portfolio and resulting net worth after representing to Mr. Maybank that they would provide such protections and then, through the acts and omissions alleged in this Complaint, attempted to disguise the shortcomings of the strategy known to Defendants by misrepresenting and/or failing to disclose to Mr. Maybank accurate and truthful information related to the costs and risks of the strategy based on the VPFCs.

> B.     Defendants breached the Agreements by placing their own interests ahead of Mr. Maybank's by creating, recommending, and executing a risky and flawed wealth management and investment strategy that was imprudent,

aggressive, uninformed, conflicted, negligent, and reckless, while assuring Mr. Maybank that the strategy was instead defensive, prudent and suitable for him.

C.    Defendants breached the Agreements by repeatedly recommending and selling risky derivative products which guaranteed substantial profits for Defendants but failed to meet Mr. Maybank's investment objectives and needs, while assuring Mr. Maybank that these products were defensive, prudent and suitable for him.

D.    Defendants breached the Agreements by repeatedly recommending and executing wealth management and investment schemes premised upon Mr. Maybank's holding of an over-concentrated position of BB&T stock which advanced Defendants' interests but failed to meet Mr. Maybank's investment objectives, while repeatedly assuring Mr. Maybank that this strategy was defensive, prudent and suitable.

E.    Defendants breached the Agreements by recommending and executing a wealth management and investment plan based on VPFCs known to Defendants to be speculative and costly, while Defendants repeatedly assured Mr. Maybank that this strategy was defensive, prudent and suitable and simultaneously failed to advise him of the substantial risks, costs and fees associated with the plan devised and recommended by Defendants;

F.    Defendants breached the Agreements by providing advice which was tainted with the patent conflicts of interest inherent in their promotion of a

wealth management and investment strategy based upon the continued holding their own company's stock, while failing to disclose this conflict of interest;

G.     Defendants breached the Agreements by recommending and selling securities and investment products as being suitable for Mr. Maybank, when in fact they knew that such securities and investment products were not suitable for Mr. Maybank at his age and position entering into retirement;

H.     Defendants breached the Agreements by representing to Mr. Maybank that VPFCs were reasonable and sound vehicles by which Mr. Maybank could attain his investment goals, while providing liquid funds to pay off his debts, when they knew or should have known that this strategy was doomed to failure and that the undisclosed information was material to Mr. Maybank;

I.     Defendants breached the Agreements by recommending a roll-over the of the VPRC, while failing to advise Mr. Maybank about the enormous early termination and roll-over fees associated with the VPFC No.2 transaction, when they knew or should have known that the undisclosed information about fees was material to Mr. Maybank; and/or

J.     Defendants breached the Wealth Management Agreement when  they failed to create the diversified portfolio promised to Mr. Maybank and then, through the acts and omissions alleged in this Complaint, attempted to disguise that failure by misrepresenting and/or failing to disclose to Mr.

Maybank accurate and truthful information related to the non-diversified nature of their investment strategy.

118.    As a direct, consequent and proximate result of Defendants' breaches of contract accompanied by fraudulent acts, Mr. Maybank has suffered injury all in direct violation of the laws of the State of South Carolina.

119.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the fraudulent acts accompanying the breaches of the Agreements, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, (6) and such other relief as is just, equitable, and proper.

**FOR A SIXTH CAUSE OF ACTION**
**(STATE SECURITIES ACT VIOLATIONS)**

120.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Sixth Cause of Action.

121.    In the course of their fiduciary duties to Mr. Maybank, Defendants recommended and advised that he enter into unsuitable transactions involving *inter alia*, the VPFCs and the Investment Account, and in so doing, misrepresented the risk of the products and Investment Account to Mr. Maybank and thereby defrauded him as is set forth in more detail in ¶¶ 84, 95, 103, 110 and 117 of this Complaint.

122.    Defendants', including Walters' and Mahfood's, actions, inaction, untrue statements and omissions were made (or not disclosed) to Mr. Maybank in connection with the offer, sale, or purchase of a security, either directly or indirectly, including, but not limited to, the VPFCs and the securities bought and sold in the Investment Account.

123.    The fraud herein alleged to have been committed by Defendants, including by Walters and Mahfood, was accomplished by means of untrue statements of material fact or omissions of material facts.

124.    On information and belief Defendants, including Walters and Mahfood, were compensated, either directly or indirectly, for the investment advice and services provided, all of which was accomplished by means of untrue statements and the development and implementation of an investment scheme that rewarded Defendants, but defrauded Mr. Maybank as alleged herein.

125.    Defendants also failed to disclose to Mr. Maybank the gross conflict of interest existing when they advised him about the management and retention of their own company's stock as is set forth in more detail in ¶¶ 84, 95, 103, 110 and 117 of this Complaint.

126.    The actions of Defendants were wrongful, fraudulent, and in violation of S.C. Code Ann. §§ 35-1-501, -502, and -509 (Supp. 2010), and the regulations regulating broker conduct established thereunder.

127.    As a consequent and proximate result of the fraud perpetrated and the misrepresentations and material omissions made by Defendants, Mr. Maybank suffered substantial damages.

128.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) costs, (3) attorneys' fees, (4) prejudgment interest at the highest legal rate, and (5) such other relief as is just, equitable and proper.

## FOR A SEVENTH CAUSE OF ACTION
### (South Carolina Unfair Trade Practices)

129.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Seventh Cause of Action.

130.    To the extent that the VPFCs or any other product or service recommended or sold to or performed for Mr. Maybank are not considered "securities" under South Carolina law, Defendants engaged in an unfair method of competition and/or an unfair or deceptive act or practice in the conduct of trade or commerce.

131.    Defendants' unfair acts and practices included recommending and implementing an investment scheme which involved the retention of a large concentrated position of Defendant's own stock, the purchase of a complex derivative product without disclosing either the risks or expenses thereof, the receipt of client assets for continued management without creating the promised diversified portfolio, all with the knowledge that Defendants' "wealth management" strategy would trap Mr. Maybank into a financial death spiral of subsequent VPFC roll-overs triggering substantial fees and tax liabilities which would eventually exhaust the value of the original stock position, leaving him with nothing, as is set forth in more detail in ¶¶ 84, 95, 103, 110 and 117 of this Complaint.

132.    The unfair and deceptive acts and practices committed by Defendant in the conduct of its trade and commerce have a potential for repetitive impact on the public interest.

133.    Such unfair acts and practices constitute a violation of the Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.* (1976) (as amended).

134. Insofar as they do not involve securities, Defendants unfair acts and practices described above constituted willful, intentional, and knowing violations of the Unfair Trade Practices Act.

135. Mr. Maybank has suffered damages as a result of the aforementioned unfair and deceptive acts and practices of Defendants in that he has suffered losses in the unsuitably managed Investment Account, paid cash calls of approximately $1,700,000, incurred substantial tax liabilities, forfeited valuable insurance policies, and incurred fees and costs associated with subsequent VPFC roll-overs incurred in the financial death spiral into which he was placed by Defendants.

136. Mr. Maybank is entitled to a judgment against Defendant BB&T for actual and consequential damages, treble damages and attorneys' fees pursuant to the Unfair Trade Practices Act, costs, and such other further relief as the Court deems just and proper.

## FOR A EIGHTH CAUSE OF ACTION
### Aiding and Abetting a Breach of Fiduciary Duty

137. The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Eighth Cause of Action.

138. Defendants, including Walters and Mahfood, owed fiduciary duties to Mr. Maybank which were breached in one or more of the preceding particulars.

139. Defendants' breaches of their fiduciary duty to Mr. Maybank were known by all the Defendants, in that they devised and implemented an unsuitable investment strategy for Mr. Maybank, failed to disclose the conflict of interests within that strategy and omitted to disclose material facts needed to insure disclosed facts were not in fact misrepresentations. By these

breaches of duty, failures, and omissions each Defendant aided and abetted all other Defendants in breaching the fiduciary duties owed by the other Defendants to Mr. Maybank.

140.    Defendants actions were imprudent, negligent, gross negligent, reckless, willful, fraudulent and made in bad faith, proximately causing Mr. Maybank to suffer damages.

141.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

### FOR A NINTH CAUSE OF ACTION
**Fraudulent Misrepresentation**

142.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Ninth Cause of Action.

143.    Defendants, including Walters and Mahfood, represented to Mr. Maybank that Walters, Mahfood and the Wealth Management/Trust Department of the Bank were all highly trained, thoroughly knowledgeable, and dedicated to championing client interests, and that they all specialized in working with clients to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of that particular client.

144.    Defendants, including Walters and Mahfood, further represented to Mr. Maybank that they had special expertise in VPFCs, including the experience of conducting an exhaustive search of the marketplace for VPFCs to find the best available VPFC to advance the comprehensive investment goals and strategy established by BB&T.

145.    Defendants, including Walters and Mahfood, further represented to Mr. Maybank that the investment strategy devised and recommended by Defendants, including the unsuitable VPFC and aggressive investment scheme, would allow Mr. Maybank to reduce the risk of his concentrated position, protect him from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth, maintain long-term share ownership of the BB&T stock, and help him achieve important diversification goals.

146.    Given Mr. Maybank's investment profile, including his age, retirement goals and tolerance to risk, Defendants' representations, including those made by Walters and Mahfood, were demonstrably false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith.

147.    Mr. Maybank relied upon the representations made to him by the Defendants, including Walters and Mahfood, each of whom was acting as his fiduciary.

148.    Defendants, including Walters and Mahfood, knew that the representations made to Mr. Maybank regarding the investment strategy they devised were false, and in recommending the strategy to Mr. Maybank, they exhibited a reckless disregard for the truth and/or falsity of their representations.

149.    Defendants, including Walters and Mahfood, intended for Mr. Maybank to act upon their advice, which was given in the course of the fiduciary relationship existing between Defendants, including Walters and Mahfood, and Mr. Maybank.

150.    Mr. Maybank did not realize or understand the falsity of Defendants' representations.

151.    Mr. Maybank had a right to rely upon the representations made to him by Defendants.

46

152.    Defendants' representations were false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith, and Mr. Maybank's reliance upon Defendants' representations were the proximate cause of the damages that he has suffered.

153.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A TENTH CAUSE OF ACTION
### Constructive Fraud

154.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Tenth Cause of Action.

155.    As set forth in the Ninth Cause of Action for Fraudulent Misrepresentation above, and in the alternative, Defendants, including Walters and Mahfood, represented to Mr. Maybank that its Wealth Management/Trust Department was highly trained, thoroughly knowledgeable, dedicated to being a champion for the interests of clients, and that it specialized in working with each client to develop an individualized, client-centric and conservative investment strategy tailored to the investment objectives, risk tolerance and investment horizon, tax status, and overall financial situation and needs of each client.

156.    Defendants, including Walters and Mahfood, further represented to Mr. Maybank that they had special expertise in VPFCs, including the experience of conducting an exhaustive search of the marketplace for VPFCs to find the best available VPFC to advance the comprehensive investment goals and strategy established by BB&T.

47

157.    Defendants, including Walters and Mahfood, further represented to Mr. Maybank that the investment strategy devised and recommended by Defendants, including the unsuitable VPFC and aggressive investment scheme, would allow Mr. Maybank to reduce the risk of his concentrated position, protect him from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth, maintain long-term share ownership of the BB&T stock, and help him achieve important diversification goals.

158.    Given Mr. Maybank's investment profile, including his age, retirement goals and tolerance to risk, Defendants' representations, including those made by Walters and Mahfood, were demonstrably false, ill-conceived and imprudent, reckless, willful, fraudulent and in bad faith.

159.    Defendants, including Walters and Mahfood, should have known the falsity of the representations they made to Mr. Maybank with respect to the investment strategy, including the unsuitable VPFC and aggressive investment scheme, that they devised, recommended and represented to Mr. Maybank would allow him to reduce the risk of his concentrated position, protect him from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth, maintain long-term share ownership of the BB&T stock, and help him achieve important diversification goals.

160.    The false representations made by Defendants, including Walters and Mahfood, were material to Mr. Maybank's decision to entrust his investment assets to the management and fiduciary care of Defendants; and Defendants intended Mr. Maybank to act upon those false representations.

161.    Mr. Maybank was completely unaware of the falsity of the representations made to him by Defendants, including the imprudence of the investment strategy devised by Walters and Mahfood specifically for him.

162.    Mr. Maybank had a right to rely upon the representations made to him by Defendants.

163.    Defendants' representations were false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith, and Mr. Maybank's reliance upon Defendants' representations were the proximate cause of the damages that he has suffered.

164.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A ELEVENTH CAUSE OF ACTION
### Fraud in the Inducement

165.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Eleventh Cause of Action.

166.    Defendants, including Walters and Mahfood, fraudulently misrepresented to Mr. Maybank that the investment strategy devised and recommended by them, including the unsuitable VPFC and aggressive investment scheme, would allow Mr. Maybank to reduce the risk of his concentrated position, protect him from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth, maintain long-term share ownership of the BB&T stock, and help him achieve important diversification goals.

167.    Defendants, including Walters and Mahfood, fraudulently misrepresented to Mr. Maybank that they had special expertise in VPFCs, including the experience of conducting an exhaustive search of the marketplace for VPFCs to find the best available VPFC to advance the comprehensive investment goals and strategy recommended by Defendants for Mr. Maybank.

168.    Defendants' misrepresentations to Mr. Maybank, particularly those by Walters and Mahfood, were intended to deceive Mr. Maybank and to encourage him to entrust his investment assets to Defendants for investment in an ill-conceived, risky, flawed, and completely unsuitable strategy, which put Mr. Maybank's investments assets in fee-generating accounts under Defendants' exclusive control.

169.    Mr. Maybank had a right to rely upon the representations made to him by his fiduciaries, and he did so rely to his great detriment.

170.    Defendants' representations were false, ill-conceived and imprudent, reckless, willful, and fraudulent and made in bad faith, and Mr. Maybank's reliance upon Defendants' representations were the proximate cause of the damages that he has suffered.

171.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## FOR A TWLEFTH CAUSE OF ACTION
### Negligent Misrepresentation

172.    The relevant allegations contained in the preceding and subsequent paragraphs are reasserted and reincorporated as fully as if set forth verbatim herein, insofar as they are not inconsistent with the allegations of this Twelfth Cause of Action.

173.    In the alternative to the misrepresentations made by Defendants being fraudulent, the misrepresentations made by Walters, Mahfood and the Bank as described above were made negligently, grossly negligently, willfully and/or recklessly.

174.    Defendants, including Walters and Mahfood, misrepresented to Mr. Maybank that the investment strategy devised and recommended by them, including the unsuitable VPFC and aggressive investment scheme, would allow Mr. Maybank to reduce the risk of his concentrated position, protect him from an extraordinary reduction in the overall value of his investment portfolio and resulting net worth, maintain long-term share ownership of the BB&T stock, and help him achieve important diversification goals.

175.    Defendants, including Mahfood and Walters, further represented to Mr. Maybank that they had special expertise in VPFCs, including the experience of conducting an exhaustive search of the marketplace for VPFCs to find the best available VPFC to advance the comprehensive investment goals and strategy established by BB&T.

176.    The above-referenced representations were false, as none of the strategies employed by Defendants achieved any of the goals promised to Mr. Maybank.

177.    Defendants, including Walters and Mahfood, had a pecuniary interest in advocating for an investment strategy that would place Mr. Maybank's assets into fee generating accounts under the sole control of Defendants.

178.    As described above, Mr. Maybank's relationship with Defendants, including Walters and Mahfood, involved a relationship of the utmost trust and confidence. This relationship was, by its essential nature, intrinsically fiduciary, calling for Defendants, both individually and collectively, to act with perfect good faith and undivided loyalty in the interests of Mr. Maybank.

179.    Defendants, including Walters and Mahfood, breached their fiduciary duties to Mr. Maybank in one or more of the particulars described in ¶103 of the Complaint.

180.    Mr. Maybank had a right to rely upon the representations made to him by Defendants who were his fiduciaries, and he did rely to his great detriment.

181.    Defendants' representations were false, ill-conceived and imprudent, negligent, reckless, willful, and fraudulent and made in bad faith, and Mr. Maybank's reliance upon Defendants' representations were the proximate cause of the damages that he has suffered.

182.    Mr. Maybank is therefore informed and believes that he is entitled to (1) actual damages, (2) consequential damages, (3) punitive damages for the gross negligence, recklessness, willful misconduct, bad faith, and/or misrepresentations and omissions, in an amount to be determined by the finder of fact, (4) costs, (5) prejudgment interest, and (6) such other relief as is just, equitable and proper.

## PRAYER FOR RELIEF

**WHEREFORE,** having set forth his claims, Plaintiff prays for judgment against Defendants as follows:

a.    For actual damages;

b.    For consequential damages;

c.    For punitive damages in an amount to be determined by the finder of fact;

d.    For treble damages pursuant to S.C. Code Ann. § 39-5-10 *et seq.*;

e.    For prejudgment interest at the highest legal rate;

f.    For the costs of this action;

g.    For reasonable attorneys' fees; and

h.    For such other and further relief as is just, equitable, and proper.

Respectfully submitted,


s/Chad N. Johnston_____
Mitchell Willoughby, Fed. Bar No. 4702
Elizabeth Zeck, Fed. Bar No. 6627
ElizabethAnn Loadholt Felder, Fed. Bar No. 7046
Chad Johnston, Fed. Bar No. 10813
**WILLOUGHBY & HOEFER, P.A**.
930 Richland Street
Post Office Box 8416
Columbia, SC 29202-8416
(803) 252-3300

Attorneys for the Francis P. Maybank

February 22, 2012
Columbia, South Carolina